## STATE *v.* LARKIN & a.

Proof of an overt act or declaration by one, in pursuance of a conspiracy by several, may be given in evidence against all the conspirators.   But the acts and declarations thus admitted must be such only as were made and done, during the pendency of the criminal enterprise and in furtherance of its objects.   If they took place at a subsequent period, and are, therefore, merely narrative of past occurrences, they are to be rejected.

The offences of stealing and of receiving property, knowing it to have been stolen, are distinct; and a person cannot be convicted of stealing, and also of receiving, the same property.

The declarations or confessions of A concerning a conspiracy with B, to steal the money of another, are not admissible against B, upon the trial of an indictment against A and B, for receiving the same money, knowing it to have been stolen.

THE indictment was against John E. Larkin, Charles M. Green and Jennette Elliott, and contained two counts.

The first was for feloniously stealing sundry bank bills, the property of Edmund Elliott, to the amount of $315.00. The second was for receiving certain bank bills knowing them to be stolen. Larkin alone was tried, the other two respondents not having been arrested.

The evidence in the case tended to show that the three respondents and one Ann Elliott, formed a plan to elope—Green with Jennette Elliott, who was the wife of Charles Elliott, and Larkin with Ann Elliott, who was not married, and was not indicted, but was used by the state as a witness. Both Ann and Charles were the children of Edmund Elliott, from whom the money was taken. The evidence also tended to show that Edmund Elliott had in his trunk in his house in Pembroke about $700.00, and that his son Charles resided about two miles from his house at Suncook, and that Green and Larkin were boarders at Charles' house; that Larkin, Green, Jennette and Ann, met at the house of Charles, when, according to the testimony of Ann, the following conversation was had : " Larkin wanted to know of me if my father was well off. I told him he was. Asked me how much money he had, and where he kept it. I told him where. Larkin wanted me to get the money. Told me to go and take it." After this conversation, he said to the others then present, " Ann has concluded to do it." Jennette said, " I think or fear she *won't* do it." Larkin said, " Yes, she will get the money.' " This was about a week before I took it." Ann then related how she took her father's money. Neither of the other parties were within two miles of her at the time, but she took the pincers and took the lock from the trunk, where the money was, and took from the packet of money there, $315.00 in bank bills of different denominations—of $50, $20, $10. She did this in the forenoon of Wednesday, February, 3, and started immediately on foot to Suncook village, arrived there at Charles' house, about two o'clock P. M., there found Larkin, Green and Jennette. " Larkin inquired of me if I had got the money. Told him I had. I went into the other room and laid it down on the bed. It was in three parcels. Green said, "we were all ready to start." It had been arranged that Green was to go with Jennette, I was to go with Larkin. We were to go to New York—wanted the money to pay our expenses—we were to have a good time. The money which I took was counted by Mrs. Sarah H.

Green. She made the amount $315.00. Jennette and I agreed to share the money equally. I took $50 of it then. Left balance with Jennette. Larkin and I started off that afternoon for Nashua. We took the name of Nash. Staid all night at Indian Head tavern. I paid fare and all bills at Nashua—both for myself and Larkin. The next day it was arranged that Larkin should go back after his baggage at Suncook, and I authorized him to receive my share of the money of Jennette. I wrote a *note* to her to pay the money to Larkin. It was to be $107.00. I then paid over to Larkin $10.00. He started off. The next day he telegraphed to me to meet him at the Commercial House in Boston on Friday of that week. I went there and staid until Monday after, but he never came near me. I returned to Hooksett on Monday, and on Tuesday went to Pembroke."

The testimony of Mrs. Esther Haines tended to show that she resided in the same house with Charles Elliott. Knew by sight both Larkin and Green. Saw Larkin with some baggage in his hands on Wednesday leave the house and go towards the depot, and on the next day come back from the depot, and never saw him after that time. Had conversation with Jennette after she came back, which was about two weeks after the money was taken; and subject to the objection of respondent, witness was permitted by the court to state, that she, Jennette, was to let Ann have $50, that Ann wrote a note to get the money, and that she let Larkin take $50 of the stolen money. This declaration was made when Larkin was not present. It appeared also by the testimony of Edmund Elliott, after respondent was arrested and confined to jail, that, on the 6th day of March last, he called at the jail at Concord and respondent substantially stated to him that he wanted to settle up the matter. Elliott said he would see about it. Larkin said he had received $10 of Ann, and $30 of Jennette, or Charles Elliott's wife. This conversation was held when Davis, the jailor, was near, who might have heard all the conversation. The prisoner stood in the walk outside of the jail. Elliott stood between Davis and the prisoner. In behalf of prisoner, Davis testified that he was present at the aforesaid interview, and heard Larkin admit he had received ten dollars of Ann Elliott and no more. Stood very near and was very positive he did not hear him say that he had received more than ten dollars; was present all the time Elliott was there. Prisoner said he had the money to pay expenses.

The Attorney General claimed to charge the prisoner on the second count only in the indictment.

Among other things, the court told the jury that all who are guilty of aiding, abetting, or assisting in the commission of crimes, of this nature, or who participate in the fruits thereof, are in law principals; or, in other words, if they were satisfied from the evidence that the three respondents unlawfully combined and agreed with Ann Elliott that she should steal the money of her father for the common use and benefit of all four of the parties, and that said Ann in pursuance of such agreement did steal the money, and that the prisoner with the

other respondents actually received some of the money, knowing it to be stolen, then all found thus participating in the reception and use of said money would be alike guilty with her who took it, and in law would be treated as principals with her; and that if they first found that Jennette Elliott was an original instigator or confederate in this crime with the respondents, then her declarations or admissions to Mr. Haines would be competent evidence for the jury to weigh in coming to a conclusion in this case; that, if they first found the existence of the unlawful combination to steal the money of E. Elliott, the immediate presence of either of the other confederates was not necessary at the time and place of committing the act by Ann.

To these instructions the respondent excepted.

The jury were also instructed to find the amount received by Larkin, provided they found him guilty of the offence as charged; and having found him guilty of receiving stolen money, to the amount of $40, the respondent moved to set aside the verdict, and for a new trial.

*Clark*, Attorney General, for the state.

*Eastman, Page & Albin*, for the respondent.

FOSTER, J.    The main question presented by the case relates to the testimony of Mrs. Haines concerning the admissions and declarations of Jennette Elliott, inculpating the respondent, Larkin.    Were these declarations admissible in evidence?

They were made in the course of a conversation which Jennette had with the witness, Mrs. Haines, very soon after the former returned from the west, which was about two weeks after the money was stolen.    The respondent was not present when they were made. These declarations implicated the respondent in the commission of the offence charged in the second count in the indictment, namely: receiving a portion of the stolen money.

It appears from the evidence that the prisoner and the party whose admissions were received, acted together and in concert with others, in an unlawful conspiracy to obtain, by the direct larceny of Ann Elliott, the money of Edmund Elliott, her father.

The court charged the jury that all who are guilty of aiding, abetting, or assisting in the commission of crimes of this nature, or who participate in the fruits thereof, are in law principals; that if they were satisfied that the three respondents unlawfully combined with Ann Elliott that she should steal the money of her father for the common use and benefit of all four the parties; and that Ann, in pursuance of such agreement, did steal the money, and the prisoner, with the other respondents, actually received some of the money, knowing it to be stolen, then all found thus participating in the reception and use of the money, would be alike guilty with her who took it, and, in law, would be treated as principals with her; that if

they first found the existence of the unlawful combination to steal the money of Edmund Elliott, the immediate presence of either of the other confederates was not necessary at the time and place of committing the crime by Ann.

These instructions were erroneous. It is undoubtedly true that where several combine together for the same illegal purpose, each is the agent of all the rest, and any act done by one in furtherance of the unlawful design, is considered in law the act of all. The evidence is very clear that the prisoner and Jennette were principals, equally with Ann, in the conspiracy to obtain the money; and if the indictment had been for the conspiracy, and not for larceny and receiving stolen money, evidence that Ann took the money would be competent to the conviction of Larkin, though Larkin was not present, aiding and abetting in such manner as to make him a principal in the theft. Proof of an overt act by one, in pursuance of a conspiracy by several, is sufficient to convict all. *Collins* v. *The Commonwealth*, 3 S. & R. 220; *Ex parte Bollman* v. *Swartwout*, 4 Cranch 78.

But the respondents are not indicted for conspiracy; and the prisoner was not tried for larceny, but for receiving stolen money. If the charge against him had been for conspiring with the others to obtain the money, the instructions would have been correct; but to constitute one a principal in the actual theft, he must be present ("except in some special cases founded in necessity"—Foster's Crown Law 349), aiding and abetting at the fact, or ready to afford assistance, if necessary. The presence need not be actual and immediate, but it may be a constructive presence; that is, the party, not actually present, must be near enough to take some active part in the prosecution of the enterprise, by aiding, assisting, encouraging or protecting the other party. 1 Russell on Crimes 26, 27; Fost. Crown Law 350; 4 Hawk. P. C. 201, 202.

In this case, the offence which the prosecuting officer elected to try was, that of receiving money, knowing it to have been stolen; and it cannot be said that a party participating in the reception and use of the money, would be considered in law as a principal with the party who stole it; although the *degree* of guilt may be the same, and the punishment of the offence the same; (as by our laws, it is,) because the offences of stealing and receiving are totally distinct, and the same person cannot be found guilty of stealing and also receiving the same property. And in England, before the statute of 3 and 4, W. & M., receivers, unless they likewise received and harbored the thief, were guilty of a bare misdemeanor. Fost. Crown Law 373. Therefore where counts for stealing and for receiving are joined in the same indictment, the public prosecutor will be required to elect (as he did in this case) upon which count he will proceed. *Rex* v. *Fowler*, 3 C. & P. 413; *Regina* v. *Blackson*, 8 C. & P. 43.

The court also told the jury that if they first found that Jennette Elliott was an original instigator or confederate in this crime with the respondents, then her declarations or admissions to Mrs. Haines

would be competent evidence for the jury to weigh in coming to a conclusion in this case.

These instructions, also, were erroneous.

It is unquestionably true, that the acts and declarations of a conspirator, may, after sufficient proof of the fact of the conspiracy, be given in evidence to charge his fellow-conspirator. This is upon the ground that the act is the act of the whole party; that they are partners in a wrongful act, and so, mutually responsible; and their declarations stand upon the same ground as their acts. 2 Stark. Ev. 403. But this proposition is to be received, subject, always, to the limitation that the acts and declarations admitted, be those, only, which were made and done during the pendency of the criminal enterprise and in furtherance of the criminal object.

If the acts and declarations took place at a subsequent period, and are, therefore, merely narrative of past occurrences, they must be rejected. To be admissible, they must have been concomitant with the principal act, and so connected with it as to constitute a part of the *res gestæ*. 1 Gr. Evid. § 111; 2 Bishop on Criminal Procedure § 191; *The State* v. *Thibeau*, 30 Vt. 100; *Patten* v. *The State*, 6 Ohio State Rep. 467; *Benford* v. *Sanner*, 40 Pa. State Rep. 12; *Commonwealth* v. *Ingraham*, 7 Gray 47; *Page* v. *Parker*, 40 N. H. Rep. 62; *United States* v. *Gooding*, 12 Wheat. 460; *Am. Fur. Co.* v. *United States*, 2 Peters 358; *Browning* v. *The State*, 30 Miss. 656; *Garth* v. *Howard*, 1 Moore & Scott 628; *State* v. *Simons*, 4 Strob. (Law.) 266; *Clanson* v. *The State*, 14 Ohio State Rep. 234.

Applying the rules of law, as thus expressed, to the present case, it is apparent that the declarations of Jennette were not made during the pendency of the criminal enterprise, nor in furtherance of the common design.

The offences, both of the larceny and the reception of the stolen money, were entirely consummated two weeks before the statements were made by Jennette to Mrs. Haines; they were made in the way and form of a narrative, a mere relation and account of past transactions; and, so far from being made in order to carry out and perfect any object connected with the crime, they were conversations held with one who was not an associate, nor in any way connected with the matter, and who had no share or interest in the fruits of the crime.

We think it would not be advisable to open the door for the admission of such declarations, beyond the limits of the principle established by the adjudged cases. Such narrative accounts are, in law, not incidental even to the main occurrence; they are unsanctioned by those tests of truth which are imposed by the obligations of an oath, the process of cross-examination and the restraint arising from the personal presence of the accused; they are liable to suspicion from the possible carelessness, misapprehension and imperfect recollection of the hearer; and, therefore, the admission of such evidence is unwarranted by sound principle and would be dangerous in practice.

It is true, the jury might have found the prisoner guilty upon the evidence of Edmund Elliott, who testified concerning admissions of the prisoner in a conversation held with him at the jail; but the jailer, who was present, did not understand the admissions as Elliott did, and it is by no means unlikely (certainly we are not at liberty to *presume* otherwise), that the evidence of Mrs. Haines may have had a controlling influence upon the jury.

The verdict must be set aside and

*A new trial granted.*