Hillsborough
No. 7422

STATE OF NEW HAMPSHIRE

v.

JOHN R. COLBY

December 30, 1976

*David H. Souter,* attorney general, and *Richard B. McNamara,* attorney *(Mr. McNamara* orally), for the State of New Hampshire.

*Kfoury & Williams (Mr. Joseph Williams* orally) for the defendant.

GRIFFITH, J.   The defendant was found guilty of conspiracy to murder (RSA 629:3) after a trial by jury. He was sentenced to not more than thirty years nor less than ten years at New Hampshire State Prison. The defendant seasonably excepted during the trial to the refusal of the trial court to ask certain questions in the court's voir dire of the jury; to the trial court's admission of certain evidence; to the denial of certain requested instructions, and, after trial, to the denial of his motions to set aside the sentence and to amend it. All questions of law raised by the defendant's exceptions were reserved and transferred by the Trial Court *(Perkins,* J.).

The present case has its genesis in the arrest of the defendant Colby and his codefendant Raymond G. Martineau on a charge of rape based upon the complaint of Wanda Graham. Miss Graham testified at a probable cause hearing and the defendants were held for the grand jury which subsequently indicted them. The bullet-riddled body of Wanda Graham was discovered shortly before the scheduled trial of the two defendants on the rape indictments.

There was evidence of the following sequence of events. On December 30, 1973, Wanda Graham appealed for help to the Manchester police. Brought to the police station in a cruiser because she feared to travel there alone, she informed the police that she had been raped and abused by Martineau and defendant Colby, both members of a motorcycle club called the Die Hards. The police officer who interviewed Miss Graham on this date testified that she appeared frightened and told of being threatened by her assailants with a beating.

As a result of Miss Graham's complaint, Martineau and Colby were arrested and held at the Hillsborough County Jail. On January 5, 1974, Joseph Baranski, a member of the Die Hards, spoke with Martineau at the jail in the presence of Colby. Mar-

tineau stated to Baranski "I want that bitch [Wanda Graham] dead." The defendant Colby was not more than a foot away from Martineau when this statement was made.

On February 7, 1974, after the probable cause hearing on the rape charge, Martineau was heard to state to a group of fellow club members and friends that he had nothing to worry about because Wanda Graham would not be alive to testify at the trial. Leonard Tierney, a Die Hard member, testified that after Martineau made this statement, the defendant said "Yuh, you got to get it done." Joseph Baranski, who was present, thought the defendant laughed but said nothing.

On the afternoon of February 23, 1974, Die Hard member William Manning visited Martineau and Colby in jail. Colby told Manning that "the State was trying to hang him because of Wanda Graham." Upon leaving, Manning received two letters, one addressed to the Die Hard club and the other to John Tanguay, the Die Hard president. He left the jail with Larry Simmons, the "sergeant-of-arms" of the Die Hards and one Donna Mailman. Manning heard Simmons ask Mailman to help him find Wanda Graham so he could shoot her.

Manning then drove with Simmons to Tanguay's apartment to deliver the letters. Tanguay took the letters into another room and conferred with Simmons. Later Manning drove Simmons to a store to buy beer and on the way asked him if he was really going to kill Wanda Graham. Simmons replied, "Yes, it's got to be done, it's for the brothers." He told Manning there were "two guys in jail that didn't belong there."

Initially, that evening Manning, on instructions from Simmons, drove Tanguay, Simmons and Donna Mailman to a Manchester night-club where Donna Mailman was left off to find Wanda Graham. After Manning refused Tanguay's order to "go with Larry Simmons" because "he knew something was going to happen," he drove them back to Tanguay's home and was told to leave. Leonard Tierney, who lived in Tanguay's home then drove back to the Manchester night-club with Simmons.

Donna Mailman found Wanda Graham in the night-club and persuaded her to leave. They were met by Simmons who forced Wanda Graham at gunpoint into the waiting car. The four then drove to a construction site in Bedford where Simmons and Wanda Graham left the car. About half an hour later, the waiting Tierney and Donna Mailman heard five shots and Simmons then returned alone. When asked what had happened, Simmons said

he had shot Wanda Graham because he had promised Martineau and Colby that he would do it. Shortly thereafter, he repeated to Tierney that he did it for Martineau and Colby because they were "his brothers."

Tierney, Tanguay and Simmons were arrested for the murder the next day and sent to the Hillsborough County jail. When Martineau and Colby first encountered them there, Martineau said, "You finally got the job done. We thank you a lot. We'll try to do the same for you and get you off." There was testimony that the defendant was "agreeing" with this statement. In the defendant's presence, Martineau asked Simmons, "How come [you] didn't do it the way we planned it?" Defendant Colby reacted to these comments by agreeing and saying, "Yuh." Martineau then said that he would be off in a couple of weeks because "he didn't think they could get him for conspiracy" and defendant Colby said nothing.

## I. Voir Dire of the Jury

The defendant requested the trial court to ask seven questions in the voir dire conducted by the trial court. Voir dire of a jury in this State, except in capital cases, has always been conducted by the trial court rather than counsel. *Patterson v. Corliss,* 112 N.H. 480, 486, 298 A.2d 586, 590 (1972). Subject to the requirements of RSA 500-A:22 (Supp. 1975), which lists certain statutory questions designed to insure the impartiality of the jurors, the decision of what questions should be propounded to jurors is a matter wholly within the discretion of the trial court. *State v. Conklin,* 115 N.H. 331, 337, 341 A.2d 770, 775 (1975); *Matthews v. Jean's Pastry Shop, Inc.,* 113 N.H. 546, 549, 311 A.2d 127, 130 (1973). In this case the trial court in addition to the statutory questions used three of the defendant's requested questions which fully explored the possibilities of bias. The court's refusal to ask the remaining four questions covering the same ground was an entirely proper exercise of its discretion. *State v. Laaman,* 114 N.H. 794, 800, 331 A.2d 354, 359 (1974).

## II. Admission of Coconspirators' Out-of-Court Statements

The defendant excepted to the admission in evidence against him of various statements of coconspirators on the grounds that they did not meet the requirements of the coconspirators' exception to the hearsay rule. The rule admits such statements when

made during the pendency of the criminal enterprise and in furtherance of the criminal object, as long as the existence of the conspiracy is sufficiently proved by independent evidence. *State v. Clapp*, 94 N.H. 62, 63-64, 46 A.2d 119, 120 (1946); *State v. Larkin*, 49 N.H. 39, 44 (1869); 4 J. Wigmore, Evidence § 1079 (Chadbourne rev. 1972); Annot., 46 A.L.R.3d 1148, § 2 (a) (1972).

The defendant objects to three statements on the ground that they fail to meet these requirements: (1) Martineau's statement to Baranski on January 5, 1974, in the Hillsborough County jail after his arrest for rape of Wanda Graham, that "I want that bitch dead"; (2) Martineau's statement on leaving the probable cause hearing that "he didn't have nothing to worry about because [Wanda Graham] wouldn't be around to testify at trial"; and (3) Larry Simmons' statement to Donna Mailman of February 23, 1974, telling her of his plan to kill Wanda Graham that evening.

The record indicates that the foregoing statements were all made during the pendency of the conspiracy and there can be no doubt that the first and third statements were made in furtherance of the criminal object. We also reject the contention of the defendant that the second statement fails to meet the "furtherance" standard. A declaration of intention to accomplish the criminal purpose, made under circumstances wherein it constitutes both a threat to the victim and a spur to the actual perpetrators of the act, is sufficiently "in furtherance" of the conspiracy to satisfy that requirement. *See* C. McCormick, Evidence § 267, at 645 (2d ed. 1972); Levie, *Hearsay and Conspiracy*, 52 Mich. L. Rev. 1159, 1167-76 (1954). Furthermore, this statement was admissible as an adoptive admission in view of the defendant's response, "Yuh, you got to get it done." *See* C. McCormick, Evidence § 269 (2d ed. 1972); 2 B. Jones, Evidence § 13:28 (6th ed. S. Gard 1972).

It is generally held that a prima facie case of conspiracy must be established to render coconspirators' declarations admissible. Annot., 46 A.L.R.3d 1148, § 5 (1972); Levie, *Hearsay and Conspiracy* 52 Mich. L. Rev. 1159, 1176 (1954). There was ample evidence in this case to meet this standard. The defendant's "Yuh, you got to get it done" evidences a tacit understanding between the parties and a demand for completion of the murder. Larry Simmons' explanation to Leonard Tierney immediately after the shooting that he had killed Wanda Graham because "he promised Ray and Gino [*i.e.*, Martineau and Colby] that he would" provides direct evidence of the defendant's participation in the conspiracy. This remark made by the killer immediately after he had fired

five shots into Wanda Graham was as the defendant admits admissible as part of the *res gestae. State v. Martineau,* 114 N.H. 552, 557, 324 A.2d 718, 721-22 (1974); *Semprini v. Railroad,* 87 N.H. 279, 280, 179 A. 349, 350 (1935); 6 J. Wigmore, Evidence § 1750 (Chadbourne Rev. 1976).

In addition to the adoptive admissions of the defendant to Martineau's references to the conspiracy after the murder, there was substantial circumstantial evidence of the conspiracy. This consisted of evidence that Wanda Graham's testimony was of significant importance to prosecution of the rape charge, that she had previously been threatened and warned by Colby and Martineau against complaining to the authorities, and the membership of both defendants and the principals in the murder in the Die Hards, a motorcycle club with a philosophy and modus operandi intended to emulate the more notorious "Hell's Angels." The record thus indicates sufficient independent evidence of the conspiracy to render the contested statements admissible. *See State v. Gilbert,* 115 N.H. 665, 348 A.2d 713 (1975).

### III. Instructions to the Jury

The defendant excepted to the trial court's failure to incorporate three of his proposed instructions into the highly detailed charge to the jury which encompassed thirty-three pages of the trial transcript. The failure of the trial court to incorporate the specific language proposed by the defendant is not error providing the instructions correctly state the law. *State v. Mannion,* 82 N.H. 518, 526, 136 A. 358, 363 (1927).

The defendant's first proposed instruction that "the crime of conspiracy entails more than mere knowledge, acquiescence or approval of the proposed act . . . ." was covered in the court's charge that "the evidence must show beyond a reasonable doubt in order to establish proof that a conspiracy existed . . . that two or more persons in some way or manner positively or tacitly came to a mutual agreement or understanding to commit or cause the commission of a crime." Similarly, the defendant's requested instruction that Martineau's statements were not to be attributed to Colby merely because he was present at the time they were made was contained in the court's instruction as to the conditions under which coconspirators' declarations are admissible against a defendant. Finally, the defendant's request that the jury be charged that if they found Larry Simmons to be on a venture of his own in

the commission of the crime they were required to find the defendant not guilty was included within the court's detailed explanation of the legal definition of conspiracy.

An examination of the charge as a whole indicates that the jury were properly instructed "in clear and intelligible language [explaining] the rules of law applicable to the issues of fact upon which their verdict [was] to be based." *Poulin v. Provost,* 114 N.H. 263, 264, 319 A.2d 296, 297 (1974).

## IV. Sentence

The trial court sentenced the defendant to an extended term of imprisonment pursuant to RSA 651:6 I (d) which provides: "If a court finds that a convicted person is more than twenty-one years of age, he may be sentenced according to paragraph II if the court also finds that ... he manifested exceptional cruelty or depravity in inflicting death or serious bodily injury on the victim of his crime." The defendant contends that the statute was improperly applied in this case because it was not intended to apply to an inchoate crime such as conspiracy. We find unacceptable the suggestion that the legislature intended to limit this provision to the killer and to exclude the persons who planned the murder and dispatched the killer.

In the Comments to the 1969 Report on the Criminal Code, it was stated: "The circumstances justifying [the longer term of imprisonment under RSA 651:6] ... are designed to take into account instances where there are strong indications that the public safety requires that authority for a long sentence be placed in the hands of the court." The appropriateness of a sentence under this provision is based upon a finding by the trial judge that the defendant manifested "exceptional cruelty or depravity," a finding amply supported by the record in this case.

Finally, the defendant contends that the trial court erred in the calculation of his conspiracy sentence. In accord with the dictates of RSA 651:3 III (Supp. 1973), which was in effect at the relevant time, the trial court correctly ordered that the defendant's ten-to-thirty-year sentence be served concurrently with the rape sentence he was already serving. The defendant argues, however, that he should have been given credit against his conspiracy sentence for time spent in custody from February 23, 1974, the date of the murder, or from December 31, 1973, the date of his initial arrest on the rape charge. We find no merit in the proposition that sen-

tence should run from the commission of the murder, or from a date prior to the time the conspiracy was even contemplated. We note that the defendant received credit under RSA 651:3 I for time spent in custory prior to trial in the calculation of his rape sentence. The trial court's imposition of the conspiracy sentence as of May 1, 1975, the date of sentencing, was entirely proper.

*Exceptions overruled.*

BOIS, J., did not sit; the others concurred.