Strafford
No. 90-015

THE STATE OF NEW HAMPSHIRE

v.

VINCENT GIBNEY

March 8, 1991

*John P. Arnold,* attorney general (*Peter G. Beeson,* senior assistant attorney general, on the brief, and *Amy Vorenberg,* assistant attorney general, orally), for the State.

*James E. Duggan,* chief appellate defender, of Concord, by brief and orally, for the defendant.

JOHNSON, J.   The defendant was convicted of conspiracy to commit first degree murder, after a jury trial in the Superior Court (*Nadeau,* J.). RSA 629:3; RSA 630:1-a. In this appeal, the defendant asserts that the trial court erred in allowing testimony regarding statements made by his wife and co-conspirator, Tina Gibney. We affirm.

At approximately 3 p.m. on March 2, 1989, Dennis Brown (the intended victim of the conspiracy) was left by a friend at his mother's house in Rochester. Brown resided there, along with his mother and his niece, the daughter of his sister, Tina Gibney. Tina Gibney lived elsewhere with her husband, the defendant, Vincent Gibney.

It had previously been arranged that Tina Gibney would meet Brown at their mother's house and then drive him to Dover for an appointment with his lawyer. On Brown's arrival, however, Tina Gibney informed him that the defendant would instead drive him to Dover. Before Brown and the defendant left, Brown's friend observed Tina Gibney giving the defendant some money.

En route, the defendant told Brown, a confirmed alcoholic, that he had some money, and suggested that they have a few drinks while in Dover. When they arrived in Dover, Brown went to his appointment, but his attorney was not immediately available. Brown then went to a bar, where the defendant was waiting for him, and had a beer.

Brown and the defendant then went to the American Legion where the defendant purchased Brown two rum and cokes before Brown returned to see his attorney. After Brown's appointment, the defendant continued to buy him drinks at various drinking establishments. Significantly, the defendant suggested that Brown have a tequila chaser with each drink. Brown testified that the defendant knew from previous experience that tequila had a particularly potent effect on him. On this occasion, the combined effects of the tequila and other alcohol caused Brown, over time, to become so intoxicated that he testified that he "flat-out blanked out." Brown had no further recollection of the evening until after the defendant's arrest several hours later.

Meanwhile, Tina Gibney tried to enlist the aid of Michael Pettibone, a friend of the defendant, to secure an "eight-ball" of cocaine. She made it clear that the cocaine was to be used to kill Brown. She explained to Pettibone that this was necessary to protect her daughter and mother from violence threatened by Brown. She told Pettibone that the defendant was out getting Brown drunk so that "it will be easier." Pettibone agreed to find the cocaine, but never actually attempted to do so. After several trips made on the pretext of looking for cocaine, Pettibone told her that he had been unable to purchase any, and returned the money she had given him. She asked him to call her later. At this point, Pettibone went to the police. He twice called Tina Gibney from the Rochester Police Station, and eventually agreed to join her, the defendant, and Brown at the Rochester Moose Club.

The police equipped Pettibone with a transmitter. An unofficial transcript of the tape recording of the resulting transmissions was made by the State. This transcript was provided to the jury, in addition to the tapes themselves, and we quote from it in recounting the subsequent events.

Pettibone joined the defendant, Tina Gibney, and Brown at the Moose Club at approximately 9:00 p.m. At this point, Brown was highly intoxicated, the defendant was "fine," and Tina Gibney was drinking only soda. Pettibone broached the subject of the conspiracy with the defendant:

"MICHAEL PETTIBONE: Well, Tina said there was a problem with Dennis, then.

VINCENT GIBNEY: Yup.

MICHAEL PETTIBONE: You guys might need some help this evening and she wanted the car."

At trial Pettibone testified that when he started this conversation with the defendant, the defendant "seemed to know. He wasn't surprised."

Pettibone then had a conversation with Tina Gibney. The essence of this conversation was that the intended victim, Brown, had expressed a desire to fight with the defendant because Tina Gibney's daughter wanted to live with her mother and the defendant, rather than continue her present living arrangement with Tina Gibney's mother and Brown. The discussion soon turned to deadly use of force:

"TINA GIBNEY: Well, if he wants to fight with Vince, we take him somewhere and they fight and . . . . (inaudible) . . . . get hit with a rock or something.

MICHAEL PETTIBONE: Yeah, that's awful permanent. You know, that's permanent. If Vince hits him and he falls and hits his head on a rock . . . ."

Later in the same conversation Tina Gibney and Pettibone agreed that the best place for the "fight" to occur would be at the Rochester Fairgrounds (the fairgrounds). They then began to discuss who was to drive to the scene and in what vehicles. Finally, the following exchange left little doubt that Tina Gibney and Pettibone were not discussing a mere fight at the fairgrounds.

"TINA GIBNEY: You can go and talk to Vince.

MICHAEL PETTIBONE: It's a little scary talking about killing people.

TINA GIBNEY: He's [Brown] gonna kill my daughter, he told me he was tonight.

. . . .

MICHAEL PETTIBONE: . . . And then just a fight and then he falls down and if he doesn't hit his head, what are we going to do? Drop a rock on him?

| | |
|---|---|
| TINA GIBNEY: | Maybe. |
| MICHAEL PETTIBONE: | Okay. |
| TINA GIBNEY: | I'm sure we can do both. |
| MICHAEL PETTIBONE: | Permanent." |

Pettibone then went to the defendant and discussed the logistics of the plan with him:

| | |
|---|---|
| "VINCENT GIBNEY: | Watch him [apparently Brown], he's hammered. |
| MICHAEL PETTIBONE: | She's [Tina Gibney] going to drive my car to the fairgrounds. You're going to take your truck to the fairgrounds." |

Pettibone and the defendant continued to discuss the plans as follows:

| | |
|---|---|
| "MICHAEL PETTIBONE: | So all's you're going to do is beat the f--- out of him. |
| VINCENT GIBNEY: | If that's what happens. |
| MICHAEL PETTIBONE: | Okay. |
| VINCENT GIBNEY: | I don't want to, but if that should happen. Tina told me one thing and she told me another thing she's always f---ing something . . . (unintelligible) . . . wrong place and the wrong time . . . . (unintelligible) . . . . if I had a f---ing eight ball of cocaine I'd shoot him up . . . (unintelligible) . . . . nobody would know nothing . . . (unintelligible). |
| MICHAEL PETTIBONE: | Yeah. That's awful permanent, too. See, I went out looking. That's what she asked me for was an eight-ball and she gave me money for it. Couldn't find nothing. |
| VINCENT GIBNEY: | Hut would probably have some, but he would't [sic] sell it to me. |

MICHAEL PETTIBONE: No, no.

VINCENT GIBNEY: He had none?

MICHAEL PETTIBONE: No. He's out of that. Yeah, he don't do that no more. I know one place, know one place . . .

VINCENT GIBNEY: Is that John?

MICHAEL PETTIBONE: Yeah.

VINCENT GIBNEY: He said Hut did it.

MICHAEL PETTIBONE: No. No. I mean, people are trying to bust him. That's a crock of sh--. That's a crock of sh--. No, everything is very hot in Rochester. I went around and looked. Thought I had an opening, seen some sh-- there was nothing, garbage.

VINCENT GIBNEY: Tina?

MICHAEL PETTIBONE: Still think you ought to go do it at the fairgrounds. She's got to drive the car. She's got to drive my wagon."

Subsequently, Pettibone left Tina Gibney and the defendant alone for a brief period. Shortly after rejoining them, the defendant told Pettibone: "Finish your drink, we gotta get going. We'll take you home and I'll do what I gotta do." Pettibone responded that he was going with them.

Pettibone, Brown, Tina Gibney, and the defendant left the Moose Club for the fairgrounds in two vehicles. The defendant and Brown were in a truck driven by the defendant. Brown was by this point only barely conscious. Tina Gibney remarked while Brown was being put into the truck that "[h]e's too f---ing drunk to fight." Pettibone was in a car being driven by Tina Gibney. The police continued to monitor their conversation, which went as follows:

"MICHAEL PETTIBONE: Yeah. In and out. It doesn't look, I mean, I didn't think Vince really understood what was going on. He didn't act

TINA GIBNEY: like he really thought this was a killing situation.

TINA GIBNEY: Oh, he knew that, but see what he wanted to do was get the f---ing coke and shoot him up. Now he's nervous ... (unintelligible) ... maybe ... (unintelligible) ... smash his head.

MICHAEL PETTIBONE: Yeah. The thing is, everything's permanent.

TINA GIBNEY: I know ....

MICHAEL PETTIBONE: Yeah, and you start it, you don't back down.

TINA GIBNEY: I'm not going to go watch. I can't stay, okay? I can't f---ing sit there and watch. (unintelligible).

MICHAEL PETTIBONE: I wish I'd a got—been able to get some coke and a needle. I couldn't a done the needle; I wouldn't a know how to do a needle.

TINA GIBNEY: Vince does.

MICHAEL PETTIBONE: Is he all right?

TINA GIBNEY: (Unintelligible) .... fight.

MICHAEL PETTIBONE: Yeah.

TINA GIBNEY: Vince starts .... fight. I don't care about who does it. I want it done so he's never going to wake up again.

MICHAEL PETTIBONE: That's permanent."

Finally, Tina Gibney stated her goal in no uncertain terms:

"TINA GIBNEY: I want him dead."

Upon reaching the fairgrounds, the four were apprehended by the Rochester police.

The defendant was indicted for conspiracy to commit first degree murder. A person is guilty of conspiracy under RSA 629:3, I, if, "with a purpose that a crime defined by statute be committed, he agrees

with one or more persons to commit or cause the commission of such crime, and an overt act is committed by one of the conspirators in furtherance of the conspiracy." Two overt acts in furtherance of the conspiracy were alleged in the indictment: first, that Tina Gibney gave Pettibone $250 to obtain cocaine "to be injected into Dennis Brown by the Gibneys after the Gibneys rendered Dennis Brown unable to resist the injection by getting him intoxicated"; and second, that the defendant brought Brown to the Moose Club "to get him intoxicated." At trial, the prosecution offered testimony regarding statements made by Tina Gibney; the defendant objected to this testimony as being hearsay and as not being admissible as the statement of a co-conspirator. Ruling that there was sufficient independent evidence of the defendant's participation in the conspiracy, the court found the testimony to be admissible under Rule 801(d)(2)(E) of the New Hampshire Rules of Evidence, which provides that a statement is not hearsay if it is offered against a party and is "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy."

The defendant asserts that for testimony to be admissible under the co-conspirator "exception" to the hearsay rule, the State must show, using evidence independent of the hearsay sought to be admitted, that the defendant was a member of the conspiracy at the time of the co-conspirator's statement. The defendant argues that in this case there is insufficient independent evidence to show that he was part of the conspiracy. Accordingly, the defendant maintains that the testimony regarding the statements of Tina Gibney was inadmissible hearsay. We disagree.

■ The defendant correctly states the test that this court employed in determining the applicability of the co-conspirator exception to the hearsay rule prior to the 1985 adoption of the New Hampshire Rules of Evidence. In *State v. Gilbert*, 121 N.H. 305, 429 A.2d 323 (1981), we held that "out-of-court statements by co-conspirators are admissible as exceptions to the hearsay rule 'when [the statements are] made during the pendency of the criminal enterprise and in furtherance of the criminal object, as long as the existence of the conspiracy is sufficiently proved by independent evidence.'" *Id.* at 311, 429 A.2d at 328 (quoting *State v. Colby*, 116 N.H. 790, 793–94, 368 A.2d 587, 590 (1976)). The proof required is that of a *prima facie* case. *State v. Colby, supra* at 794, 368 A.2d at 591. "Independent evidence" is any evidence which is otherwise admissible. *See United States v. Cambindo Valencia*, 609 F.2d 603, 635 n.24 (2d Cir. 1979).

■ The State urges us to adopt the United States Supreme Court's interpretation of Rule 801(d)(2)(E) of the Federal Rules of Evidence. In *Bourjaily v. United States*, 483 U.S. 171 (1987), the Court held that trial courts "may examine the hearsay statements sought to be admitted" in determining whether there is sufficient evidence of a conspiracy under Rule 801(d)(2)(E). *Id.* at 181. Applying the federal interpretation in this case would have permitted the trial court to consider all of Tina Gibney's otherwise inadmissible hearsay statements in deciding whether there was a conspiracy and whether, therefore, those same statements were admissible into evidence. However, because we hold the conspiracy to have been sufficiently proved by the independent evidence produced by the State, we decline to consider whether Rule 801(d)(2)(E) of the New Hampshire Rules of Evidence is inconsistent with *Gilbert* and whether the rule should be interpreted as the State suggests in accordance with *Bourjaily*.

A substantial amount of independent circumstantial evidence implicated the defendant in a conspiracy to kill Brown by injection of a lethal dose of cocaine. Most damaging is the defendant's statement to Pettibone that: "If I had a f---ing eight-ball of cocaine, I'd shoot him [Brown] up . . . nobody would know nothing." The defendant concedes in his brief that this "statement evidences a desire to kill Dennis Brown." The defendant correctly asserts that "being desirous of committing a crime is not a crime." Nevertheless, we find that it is reasonable to infer that this statement, taken in context with the other evidence produced by the State as set forth below, relates back to a *prior agreement* between the defendant and his wife to kill Dennis Brown.

■ The defendant's stated desire to "shoot him up" should be viewed against the following background of independent evidence. First, Pettibone testified that Tina Gibney had asked him to procure cocaine and the instrumentalities (the "works") for injection, and that she had given him money to that end. Tina Gibney's request is independent evidence because it is, by definition, not hearsay. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. N.H. R. Ev. 801(c). Because requests and commands do not assert facts, they cannot be hearsay. *See United States v. Gibson*, 675 F.2d 825, 834 (6th Cir.), *cert. denied*, 459 U.S. 972 (1982).

Second, Tina Gibney supplied the defendant with money. The defendant immediately told Brown, a known alcoholic, that he would purchase drinks for Brown in Dover. The defendant suggested that

Brown drink tequila, which he knew had a particularly potent effect on Brown. There was additional testimony from Pettibone's girl friend that Tina did not like her husband to go out drinking with Brown, and Brown testified that the defendant had seldom previously purchased him drinks. Third, the defendant, who remained sober while the intended victim "blanked out," later brought Brown to the Moose Club, where the gathered conspirators would have him under their control.

Fourth, after the defendant expressed his regret that he did not have the "eight-ball of cocaine . . . to shoot him [Brown] up," Pettibone informed the defendant that Tina Gibney had given him (Pettibone) money to procure cocaine, but that he had failed to find any. The defendant gave no indication that this was a surprising revelation. Instead, he questioned Pettibone as to other possible sources of cocaine and whether a possible supplier would sell to the defendant.

Fifth, the defendant's expression of a willingness to engage in a fight with Brown was little more than a charade, given that the transcript indicates that Brown was virtually unable to walk or talk. Sixth, the defendant then drove the almost completely helpless Brown to the fairgrounds. Seventh, the defendant expressed to Pettibone that "I'll do what I gotta do."

Some of these events refer to a method of killing other than that charged in the indictment, as the original plan was frustrated by circumstances beyond the control of the conspirators. However, they constitute relevant circumstantial evidence of the defendant's original agreement with his wife to kill Brown. *See State v. Gruber*, 132 N.H. 83, 93, 562 A.2d 156, 162 (1989).

■ Given the independent evidence described above, and the reasonable inferences therefrom, we find that the State met its burden of making a *prima facie* case that the defendant and his wife conspired to take the life of Dennis Brown. Therefore, we hold that the trial court did not err in admitting testimony regarding Tina Gibney's statements because those statements are non-hearsay under Rule 801(d)(2)(E) of the New Hampshire Rules of Evidence.

*Affirmed.*

All concurred.