Hillsborough
No. 6953

STATE OF NEW HAMPSHIRE

v.

RAYMOND G. MARTINEAU & a.

August 15, 1974

*Warren B. Rudman*, attorney general, and *David W. Hess*, assistant attorney general (*Mr. Hess* orally), for the State of New Hampshire.

*Mr. Edmund J. Murphy*, by brief and orally, for Raymond G. Martineau.

*Kfoury & Williams* (*Mr. Joseph Williams* orally) for John R. Colby.

GRIFFITH, J. This is a criminal case in which defendants Raymond G. Martineau and John R. Colby are charged with committing the crimes of rape (RSA 632:1 (Supp. 1973)) and deviate sexual relations (RSA 632:2 (Supp. 1973)) upon Wanda Graham, deceased complainant, at approximately 8:00 p.m. on December 30, 1973, in a Manchester, New Hampshire apartment located at 80 Lowell Street. The body of Wanda Graham, apparently murdered, was discovered shortly before trial. Defendants waived their right to trial by jury and the trial commenced before *Loughlin*, J. During the course of the trial defendants excepted to the introduction of certain evidence. By agreement of the State and defendants, at the close of the State's case and before completion of the case, the trial court made findings of fact and transferred without ruling certain questions of law raised by defendants' exceptions.

The reserved case and the transcript indicate the following sequence of events on the evening of December 30, 1973, and during the early morning hours of December 31, 1973. The testimony of the first two witnesses, Donna Biron and Patricia Simpson, was reluctant and of little aid to the state's case. The testimony of Bruce Page indicated that when he arrived at the 80 Lowell Street apartment between 5:30 and 6:00 p.m., defendant Colby, Donna Biron, Patricia Simpson, and the complainant Wanda Graham were already there. Raymond Martineau arrived sometime later. Page testified that Colby accused Wanda of "ratting on him by going to the police", then kicked her and threw her into a bedroom. He indicated that they were in the bedroom for approximately one-half hour and that he heard Wanda crying and

the bed squeaking. He testified that when they reentered the living room Colby had his belt unbuckled, but Wanda was fully dressed.

After observing Wanda enter the bathroom and then reappear in the living room, Page observed Raymond Martineau strike her on the head twice. He then heard Martineau order her back into the bedroom and saw him accompany her into that room. Since there was no door, but only an open archway separating the bedroom from the room in which Page was sitting, he was able to see them engaging in the act of fellatio. When Martineau reentered the livingroom, Page saw in his hand a knife, which Martineau subsequently twice threw across the apartment into the far wall of another bedroom. He was not certain where Wanda was situated when the knife was thrown. Page heard Martineau tell Wanda that he would kill her if she went to the police. He then heard Martineau tell Wanda to get him $30 from the Venice Room, a cocktail lounge in the neighboring Cadillac Hotel. Lastly, Page testified that out of concern for Wanda's well-being he followed her to the Venice Room and told her to "split", but was then asked to leave the premises by the hotel manager, Robert Proulx.

Robert Proulx testified that Wanda Graham, a former employee, arrived at the Venice Room between 8:30 and 9:00 p.m. He then testified over defendants' objections that Wanda told him that she had been raped and had a knife thrown at her. He indicated that he refused Wanda's request for money and when he suggested to her that she go to the police she indicated that "they" would harm her if she did. Mr. Proulx further testified that during his meeting with Wanda Graham she was crying, was expressing fear, and was in an hysterical condition.

After Wanda's meeting with Robert Proulx, she was taken behind the bar in the Venice Room by Doris Belleville, the bartender. Doris testified that she was trying to hide Wanda. Wanda stayed behind the bar with her for about one and a half hours. Since Doris was also working, her discussions with Wanda were intermittent. She testified, also over defendants' objections, that Wanda had told her that the "Diehards" got her. ("Diehards" being the sobriquet of the defendants'

motorcycle club.) Doris asked what the Diehards had done to her and Wanda said "everything". In response to Doris' question "Which Diehards?" Wanda answered, "Martineau Ray and Gino." Wanda told Doris that they were going to kill her. Doris also testified that Wanda was in fear, crying and hysterical. There was also testimony by Doris Belleville that one Donna Mailman was sent to take the complainant out from behind the bar to bring her to the defendants. After identifying Donna Mailman at the trial, Doris testified as follows: "And I told her, 'I won't let her go.' Because Wanda, she was just like she was crazy and everytime she [Donna Mailman] mentioned, 'I have to take her out,' Wanda would hold on to me and say, 'Keep me. They are going to kill me. Keep me.' And she left and she came and after that she said, 'Doris, I have to take her out. If I don't, I am going to get killed.' I said, 'That is your problem.' Just then she left by the back door." (T. 137).

At some point Wanda Graham changed her mind about going to the police and at approximately 11:50 p.m., she spoke with Captain Edmund LeBoeuf of the Manchester Police Department. Captain LeBoeuf testified, also over defendants' objections, that Wanda told him she went to the apartment at 80 Lowell Street at about 1:00 a.m. on December 30, 1973. She indicated that she slept until about 1:00 p.m. She stated that Martineau arrived at approximately 7:00 p.m. and Colby at about 8:00 p.m. Captain LeBoeuf testified that Wanda told him that Colby then brought her into the bedroom at knifepoint, had sexual intercourse with her and then "committed the act of fellatio." She told him Martineau then duplicated each of Colby's sexual activities with her, also at knifepoint. Captain LeBoeuf also indicated that Wanda said she yelled several times, but nobody came to her assistance.

At approximately 1:00 a.m. on December 31, 1973, Captain LeBoeuf instructed another police officer to bring Wanda to the Sacred Heart Hospital, where she was later examined by Dr. Ali Ata. Dr. Ata testified that he observed a bruise of approximately one-half inch on Wanda's head. His examination of the genital area disclosed that the vulva and vagina were red, swollen and tender to the touch. Dr. Ata also

observed a white fluid in and around the genital area which a laboratory examination indicated was sperm. The doctor indicated in his testimony that in all probability sexual intercourse had taken place within the last twenty-four hours prior to his examination, but admitted on cross-examination that it could have taken place as long as thirty hours prior to his examination.

The first question transferred for our consideration is whether the trial court was in error when after finding the statements of Wanda Graham to Robert Proulx and Doris Belleville to be a part of the *res gestae*, it admitted them only as bearing on the credibility of the complainant and as bearing on the complainant's state of mind with reference to consent, and not as evidence of the truth of the facts stated. The trial court relied on *State v. Lynch,* 94 N.H. 52, 45 A.2d 885 (1946), as authority for its ruling. While the *Lynch* case is good support for the limited admissibility to which the trial court refers, that case dealt with statements that were hearsay and not "so spontaneous as to be admissible as a part of the *res gestae.*" *Id.* at 53, 45 A.2d at 886. It is implicit from the trial court's finding that the statements in question were a part of the *res gestae*, that they possessed the requisite spontaneity and contemporaneity to warrant their inclusion within the spontaneous exclamation or excited utterance exception to the hearsay rule. *See Semprini v. Railroad,* 87 N.H. 279, 280, 179 A. 349, 350 (1935); *Bennett v. Bennett,* 92 N.H. 379, 386, 31 A.2d 374, 380 (1943); Proposed Federal Rules of Evidence rule 803 (2) (1973). *See also* C. McCormick, Evidence § 297, at 704-09 (2d ed. 1972).

Defendants argue that Wanda Graham's statements to Robert Proulx and Doris Belleville were too remote in time from the alleged crimes to justify their admissibility as excited utterances. While it is true that contemporaneity is a factor to be considered in determining the admissibility of such statements, it is by no means controlling, and such things as the nature of the event, the victim's state of mind, and all other circumstances are important considerations. *Bennett v. Bennett,* 92 N.H. 379, 386, 31 A.2d 374, 380 (1943); *State v. Carraturo,* 308 A.2d 828, 831 (R.I. 1973); *State v. Medicine Bull,* 152 Mont. 34, 44-45, 445 P.2d 916, 922 (1968);

*Commonwealth v. Cheeks,* 423 Pa. 67, 70, 223 A.2d 291, 293 (1966). The precise amount of time that may elapse before a statement loses its spontaneity as an excited utterance evoked by a startling event and becomes a mere narrative cannot be established by any absolute rule of law and accordingly, "[m]uch must be left to the discretion of the [trial] court in admitting or rejecting such testimony." *Dorr v. Railway,* 76 N.H. 160, 162, 80 A. 336, 337 (1911); *State v. Lavallee,* 104 N.H. 443, 448, 189 A.2d 475, 479 (1963); *Bennett v. Bennett,* 92 N.H. 379, 386, 31 A.2d 374, 380 (1943); *Commonwealth v. Cheeks,* 423 Pa. 67, 70, 223 A.2d 291, 293 (1966).

While it is possible that some of complainant's statements to Doris Belleville may have been uttered as much as two or three hours after the alleged offenses, a careful review of the transcript shows that there is strong evidentiary support for the trial court's finding that they were a part of the *res gestae.* In view of the testimony of the continued attempts to remove Wanda from the bar during this period with threats of violence and exclamations of fear, the trial court could have found that the entire incident in the Venice Room was a continuation of the terrorizing events Wanda hysterically complained of. *United States v. Kearney,* 420 F.2d 170, 174-75 (D.C. Cir. 1969); *People v. Parisie,* 5 Ill. App. 3d 1009, 1029, 287 N.E.2d 310, 322 (1972); Slough, *Spontaneous Declarations and State of Mind,* 46 Iowa L. Rev. 224, 243 (1961); Annot., 19 A.L.R.2d 579 (1951). After having determined that Wanda Graham's statements to Robert Proulx and Doris Belleville were sufficiently spontaneous under the circumstances to be considered a part of the *res gestae,* the trial court should then have admitted them as proof of the truth of the matters asserted. *See Semprini v. Railroad,* 87 N.H. 279, 280, 179 A. 349, 350 (1935); *State v. Mancini,* 108 R.I. 261, 269-70, 274 A.2d 742, 746-47 (1971).

The next question for our determination is whether the statements given by Wanda Graham to Captain LeBoeuf of the Manchester Police Department at approximately 11:50 p.m. on December 30, 1973, are admissible as an exception to the hearsay rule. The complainant spoke with Captain LeBoeuf after she had spent some time with Doris Belleville. There is no testimony indicating that she still was in a state

of excitement or hysteria when she spoke to Captain LeBoeuf. His testimony was that she was a little apprehensive about making the complaint, but there was nothing to show that her answers to his questions were anything other than a narrative of past events. While responses to questions may still possess the requisite spontaneity to be admissible as excited utterances *(Semprini v. Railroad,* 87 N.H. 279, 280, 179 A. 349, 350 (1935); *Gibbs v. Wilmeth,* 261 Iowa 1015, 157 N.W.2d 93 (1968); *Commonwealth v. Hampton,* 351 Mass. 447, 221 N.E.2d 766 (1966)), a mere narrative of past events without any evidence of spontaneity does not possess sufficient indicia of reliability and trustworthiness to qualify as an exception to the hearsay rule. *Bennett v. Bennett,* 92 N.H. 379, 386, 31 A.2d 374, 380 (1943); *cf. State v. Russell,* 114 N.H. 222, 224, 317 A.2d 781, 782 (1974). While hearsay, the statements to Captain LeBoeuf, may, however, be admitted for the purpose of contradicting any "inference of incredibility of the complainant's testimony that might be drawn from her failure to complain seasonably of the attack, or (2) as bearing on complainant's state of mind with reference to consent . . . ." *State v. Lynch,* 94 N.H. 52, 45 A.2d 885 (1946).

The State argues in the alternative that even though Wanda Graham's statements to Captain LeBoeuf are found inadmissible under the spontaneous exclamation exception to the hearsay rule, they should be admitted under the doctrine of necessity because the complainant is unavailable to testify at the trial. *See Piper v. Fickett,* 113 N.H. 631, 312 A.2d 698 (1973); Model Code of Evidence rule 503 (a), at 231-32 (1942). The State asserts that the admission of Wanda's extrajudicial statements would be consistent with this court's holding in *State v. Grierson,* 96 N.H. 36, 38, 69 A.2d 851, 853 (1949). In the *Grierson* case testimony given by a witness at a preliminary hearing was admitted as substantive evidence at the trial when it was shown that the witness had been subjected to cross-examination at the hearing and had died before the trial. In the present case the deceased complainant testified at the preliminary hearing, but since that proceeding was not recorded and no testimony of the hearing was offered, the record before us gives no indication as to the content of that testimony. Thus, without a showing that Wanda

Graham's testimony at the preliminary hearing related to her statements to Captain LeBoeuf, *State v. Grierson,* 96 N.H. 36, 38, 69 A.2d 851, 853 (1949) cannot be considered authority for their admission into evidence as substantive proof. While we recognize some authority for admitting such statements when, as here, the death or unavailability of the declarant was not caused by the party [the State] seeking to introduce them (Proposed Federal Rules of Evidence rule 804 (a) 4, 5 (1973); C. McCormick, Evidence § 253, at 608-13 (2d ed. 1972)), the substance of the statements might have been introduced through witnesses who were privy to Wanda's testimony at the preliminary hearing (*State v. Grierson,* 96 N.H. 36, 38, 69 A.2d 851, 853 (1949)) and therefore, we cannot agree that a true showing of necessity has been made.

The State also argues in its brief that in the event Wanda's statements are found to be inadmissible as violative of the hearsay rule, it should be allowed to reopen its case for the purpose of introducing the evidence of Wanda Graham's testimony at the preliminary hearing. It is within the province of the trial court to consider this matter when it is presented to it. "It is the rule in criminal cases that the trial court in the exercise of sound discretion may reopen a case for the purpose of admitting testimony in behalf of either the prosecution or the defense." *State v. Comparone,* 110 N.H. 398, 399, 269 A.2d 131, 132 (1970); *State v. Streeter,* 113 N.H. 402, 403, 308 A.2d 535, 536 (1973); *State v. Petkus,* 110 N.H. 394, 397-98, 269 A.2d 123, 125 (1970).

The last question that has been transferred was raised by the trial court when it was disclosed to it that the defendants had been indicted for the crime of conspiring to murder the now-deceased complainant. The trial court questioned whether the defendants could rely on their constitutional right to confront the witnesses against them, if it is determined that they were responsible for the complainant's death. We understand this to raise the question whether a defendant who participates in the murder of a witness may properly object to hearsay statements of that murdered witness. The determination of this question would require us to speculate on the result of a trial in a collateral matter. Such speculation as to the guilt of the defendants in that proceeding would

disregard the presumption of innocence that every defendant is accorded under our system of criminal justice. Accordingly, neither this court nor the trial court should be concerned with the foregoing question at this time.

*Remanded.*

GRIMES, J., did not sit; the others concurred.