THE STATE OF OHIO, APPELLEE, *v.* SMITH, A.K.A. KENNON, APPELLANT.

(No. CA-2345—Decided July 3, 1986.)

*Cathy Dutton,* assistant prosecuting attorney, for appellee.

*Tarkowsky-Baran Legal Services* and *John Tarkowsky,* for appellant.

PUTMAN, P.J. There are five errors assigned in the appeal from a sentence entered by the Richland County Court of Common Pleas upon a jury verdict of guilty of "rape," former R.C. 2907.02(A)(1)(see 139 Ohio Laws, Part I, 523, 538-539, and 139 Ohio Laws, Part II, 2285, 2298-2299).

They read:

Assignment of Error No. I

"The trial court erred in refusing to allow testimony of the alleged victim's sexual intercourse with two other individuals within 24 hours of the alleged rape where such evidence involved the origin of semen and its probative value outweighed any inflammatory or prejudicial nature pursuant to O.R.C. § 2907.02(D)."

### Assignment of Error No. II

"The trial court erred in permitting the majority of the state's witnesses to testify due to the state's refusal to apprise defendant of the identities of its witnesses before the day of trial."

### Assignment of Error No. III

"The trial court erred by denying defendant's motion for acquittal on the basis that the jury's verdict was against the manifest weight of the evidence and contrary to law."

### Assignment of Error No. IV

"The trial court committed prejudicial error in admitting into evidence the emergency room report, the sexual assault kit, State Exhibit 5, within which physical samples were drawn from the alleged victim based on the state's failure to establish the samples were properly taken and failure to establish a proper chain of possession of Exhibit 5 to insure its trustworthiness and absence of tampering."

### Assignment of Error No. V

"The trial court committed prejudicial error in allowing Mr. and Mrs. Nesrick and Officer Grogoza, state's witnesses, to testify as to the alleged victim Loreen Weeks' description of the alleged rape, such description being hearsay and not evidence of the truth of the matter described."

We sustain the first and second assignments of error, overrule the third, fourth and fifth assignments of error, reverse the judgment and remand for further proceedings. Our reasons follow in our serial consideration thereof.

First, the prosecution agrees for the limited purpose of this appeal with the appellant's statement of the case.

During its May 1985 term of service, the Richland County Grand Jury returned an indictment against defendant Marshall Smith, a.k.a. Marshall Kennon, alleging that on January 3, 1985, defendant did:

"[E]ngage in sexual conduct with another, not the spouse of the offender, by purposely compelling the other person to submit by force or threat of force, in violation of Section 2907.02(A)(1) of the Ohio Revised Code, an aggravated felony of the first degree."

On June 4, 1985, defendant filed a request for discovery requesting the state to provide a copy of or right to view the exhibits the state intended to call at trial and the identity of any expert witness along with a synopsis of his expected testimony. A motion for a bill of particulars was filed at the same time.

On June 19, 1985, the date of defendant's pretrial, the state provided defendant with a reply to the request for discovery revealing only defendant's prior record and nothing more. Defendant provided the state with whatever discovery was requested to the state's satisfaction.

The bill of particulars filed by the prosecution on July 23, 1985 reads, in part, as follows:

"On or about January 3, 1985 at approximately 10:45 p.m. at the County of Richland, 335 Newman Street, Mansfield, Ohio, he did engage in sexual conduct with Loreen Weeks, not the spouse of the offender, by purposely compelling her to submit by force or threat of force, in violation of Section 2907.02(A)(1) of the Ohio Revised Code, an aggravated felony of the first degree."

On August 6, 1985, defendant filed a motion requesting an *in camera* hearing to resolve any disputes concerning the evidence to be introduced at trial in accordance with R.C. 2907.02(E).

Also, on August 6, 1985, a motion *in limine* was filed by the defendant and served upon the prosecutor who tried the case; in addition, a copy was

given to the trial judge during a conference in chambers held to continue the trial date from August 8, 1985 to September 10, 1985. The subject of the motion *in limine* was to preclude the state from submitting evidence at trial in the form of witness testimony or tangible objects not revealed in response to the request for discovery previously filed.

On September 6, 1985 the state offered defendant four names of witnesses it intended to call at trial, two of which names were in error.

On September 10, 1985, after the jury was selected in the case herein, the state furnished defendant with a list of thirteen additional witnesses it intended to call to testify. Defendant timely objected to their testimony.

Trial began September 10, and ended September 13, 1985. Prior to the admission of testimony before the jury and after a hearing held pursuant to R.C. 2907.02(E), defendant made a motion to allow the testimony of John Taylor as to his sexual conduct with the alleged victim within twenty-four hours of the alleged rape and as to the gathering of evidence after the alleged rape. The motion was denied. It was later renewed and again denied. Defendant made a motion *in limine* at that time to stop the state from presenting witnesses not previously disclosed by discovery. The motion was denied. Defendant made a motion for acquittal after the close of the state's presentation of evidence and at the close of the trial. The motions were denied. The jury found the defendant guilty of the offense charged. A journal entry was filed accordingly. On September 16, 1985, defendant was sentenced to a term of ten to twenty-five years of incarceration.

## I

To appreciate the argument of the appellant, a recital of his claim as to the evidence is essential. It is here substantially repeated from his brief:

Loreen Weeks, the alleged victim, accused the defendant, Marshall Smith, a friend with whom she had lived on a prior occasion, of sexually assaulting her in a manner described as rape. Present at the time of the alleged rape were John Taylor, Weeks' boyfriend and defendant's cousin, and JoEllen Smith, a good friend whom Weeks alleged had beaten her with a baseball bat, but with whom she had also lived after the alleged rape, and to whom she subsequently had written letters inquiring as to the well-being of Marshall Smith. Also present was Loreen Weeks' son, Bobby.

Immediately prior to the alleged rape, Weeks had implicated JoEllen Smith's daughter (also appellant Marshall Smith's former stepdaughter) in a forgery scheme. This gave Marshall Smith cause to be angry with Weeks, and with JoEllen Smith, his former wife, for allowing Weeks into her home.

On January 3, 1985, and prior to the rape, Weeks had drunk some wine and was making conversation with her boyfriend and JoEllen Smith. Marshall Smith called on the telephone, became angry with JoEllen Smith due to Weeks' presence, and stated he would come to the home directly from work.

Weeks testified that upon entering the home, Marshall Smith began an argument with JoEllen Smith and ordered Weeks out. She testified that she left. She alleged being assaulted outside the home. She then alleges she was forced back into the home, where she was verbally assaulted. Defendant admits physically assaulting Weeks, but denies any sexual activity occurred. Weeks then alleged she was forced to admit she desired to have sexual relations with the defendant. Taylor and JoEllen Smith testified Weeks was not forced to admit same,

but did so after being questioned by the defendant. After the admission, Jo-Ellen Smith became emotional and accused Weeks of betraying her.

A scuffle ensued between defendant and Weeks, which lasted approximately ten minutes, much of which was out of the view of Taylor and Jo-Ellen Smith. Both Taylor and JoEllen Smith testified that for approximately five minutes, out of their view, an altercation took place in the rear of the Smith residence, but no sounds or conversation could be heard which would lead them to believe a rape was in progress. They testified that Weeks emerged from the rear of the home, fully clothed and in fairly good spirits, and left the home with her son. She did not allege any rape had occurred, not to her best friend, JoEllen, nor to her boyfriend, John Taylor, who testified he would not have permitted it.

Weeks testified that she was forced to have sexual intercourse with the defendant in the rear of the home for twenty minutes, due to her fear of defendant. No physical force was used. She alleges she was forced to have sexual relations with the defendant, which defendant denies, yet, she maintains defendant is a truthful person. She also admitted that none of her clothing was torn, that she was not bleeding, and that she showed no outward signs of emotion immediately after the alleged rape. The force Loreen Weeks alleged the defendant used was "just tone of voice." No physical force was used. There is no evidence of a threat of force.

Weeks then testified that she walked to her home and, at some point in time that night, spoke with Mr. and Mrs. Nesrick, her landlords, who subsequently called the police. The Nesricks testified, in detail, relating Loreen Weeks' account of her alleged rape. Officer Grogoza was also permitted to testify as to the details of the alleged rape, as related to her by Loreen Weeks. Both the Nesricks' hearsay testimony, and that of Officer Grogoza, were objected to. She was then taken to the Mansfield General Hospital, where she was examined by a physician, who also prepared a sexual assault kit. Furthermore, no one testified as to the kit's authenticity, that it was not altered, and that it was, in fact, the same kit examined by the police serologist. Defendant timely objected. The same physician partially prepared an emergency room report. No records librarian appeared from the hospital to introduce the report as a business record. Defendant objected to the introduction of both. Defendant was voluntarily at the hospital after his arrest and voluntarily gave samples for inclusion in his sexual assault kit.

Tony Tambasco, the Mansfield Police Department's serologist who examined Weeks' sexual assault kit composed of vaginal swab slides, seminal fluid and sperm samples taken from her, pubic combing samples, and clothing samples, could find no evidence linking Weeks to defendant as the rapist. Appellant points out that no negroid hairs could be found on Weeks' clothing, and states that Weeks is Caucasian while the defendant is a Negro. The pubic combings of each proved the same. The enzyme test proved negative, showing that the seminal fluid and sperm may not have come from the defendant. Furthermore, Tambasco, testifying as an expert, stated that sperm could survive in a woman's vagina for up to five days. This is significant, due to John Taylor's testimony during a hearing held out of the presence of the jury, which testimony was ruled inadmissible by the trial court, wherein Taylor testified that he had sexual intercourse with Weeks within twenty-four hours of the alleged rape, and that he had seen visible signs of Weeks' having had

intercourse with another individual shortly before he did. Furthermore, although Weeks denied having intercourse with that other individual, one Willie Evans, on January 2, 1985, she admitted to Taylor that she had had relations with Evans. The trial judge ruled Taylor's testimony was inadmissible on the basis that he "simply did not believe Taylor."

With respect to Weeks' motive in making the charge against defendant, the following is important to note:

Weeks testified she "usually" doesn't seek revenge against people with whom she has a dispute. Yet, she admitted to making at least seven complaints with the Mansfield Police Department against former boyfriends in the nature of assaults perpetrated by them upon her. During all those occasions, she had not followed through with pressing the charges after making the complaints.

Furthermore, Weeks admitted to changing her mind on numerous occasions as to whether she desired to proceed against defendant or drop all charges. She went so far as to write letters to the prosecutor and defendant's attorney stating she did not wish to proceed, as well as telling her friends and Marshall she was sorry for even wrongfully alleging that she had been raped. She testified that she was afraid to proceed and afraid not to, although she freely communicated with the defendant while he was incarcerated, and that she lived with the woman whom she alleged hit her repeatedly with a baseball bat at the time of the rape and to whom she freely gave her Arizona address, knowing the address could be conveyed to the defendant.

Three witnesses who were present at the time of the alleged rape and the defendant state unequivocally that a rape or sexual contact of any nature simply did not occur. Only the alleged victim, who changed her mind fre-

quently, maintained a rape had occurred. An assault, verbal and possibly physical, prior to the time Weeks alleged the rape occurred, is admitted; rape is not.

The trial judge refused to permit the testimony of John Taylor, preserved for review by a hearing held pursuant to R.C. 2907.02(E), to be heard before the jury, solely because he, the judge, did not believe it — thus taking credibility from the jury. If believed, it proved that Loreen Weeks, the alleged victim of the rape, had sexual intercourse with John Taylor within twenty-four hours of her testing for semen by the Mansfield General Hospital following the alleged rape by defendant and sexual intercourse with Willie Evans a few hours prior to that.

R.C. 2907.02(D) provided:

"Evidence of specific instances of the victim's sexual activity, opinion evidence of the victim's sexual activity, and reputation evidence of the victim's sexual activity shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the offender, and only to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value.

"Evidence of specific instances of the defendant's sexual activity, opinion evidence of the defendant's sexual activity, and reputation evidence of the defendant's sexual activity shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or disease, the defendant's past sexual activity with the victim, or is admissible against the defendant under section 2945.59 of the Revised Code, and only to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudi-

cial nature does not outweigh its probative value."

Appellant argues, and we agree, that the testimony of John Taylor was relevant to ascertain the origin of the semen found by a physician with the Mansfield General Hospital after examining the alleged victim, as claimed by defendant, who denied having sexual intercourse with Loreen Weeks. We also agree that failure to permit such testimony left the jury with no other alternative but to assume the semen was deposited by the defendant. Appellant argues that he was denied his constitutional right to present evidence to the contrary, and that he was deprived of his constitutional right to confront his accuser, and of due process under the law.

We agree, and reverse upon the authority of *State* v. *Williams* (1986), 21 Ohio St. 3d 33, 21 OBR 320, 487 N.E. 2d 560. This evidence was not offered solely to impeach the victim's credibility, and evidence admissible in furtherance of the constitutional rights of an accused cannot be excluded no matter how much it destroys the victim's credibility.

The trial court excluded appellant's evidence on the origin of semen based solely on the issue of credibility, saying he "simply did not believe Taylor." Credibility is not an issue in determining applicability of Ohio's rape shield law, R.C. 2907.02. Accordingly, the ruling was contrary to statutory law.

The issue of the presence and origin of semen was raised by the state in its case-in-chief. The origin of semen became thereby a fact in issue. A defendant can introduce relevant evidence on any fact in issue, subject to the strictures of the Ohio Rules of Evidence and R.C. 2907.02(D). These strictures are in turn modified by the constitutional right to confront witnesses.

Once the origin of semen becomes a fact in issue, the trial court's sole function is to determine the relevancy, competency and materiality of the defendant's evidence, and to weigh its inflammatory and prejudicial effect against its probative value. See R.C. 2907.02; Evid. R. 403(A). The trial court does not violate the defendant's confrontation rights by precluding the introduction of irrelevant, incompetent, immaterial or overly prejudicial evidence. See, *e.g., Pratt* v. *Parratt* (C.A. 8, 1980), 615 F. 2d 486, certiorari denied (1980), 449 U.S. 852 (applying Nebraska law); *People* v. *McKenna* (1978), 196 Colo. 367, 585 P. 2d 275; *People* v. *Arenda* (1982), 416 Mich. 1, 330 N.W. 2d 814. Furthermore, the trial court is to determine whether the purpose of the introduction of the otherwise admissible evidence as to the origin of semen is offered for the sole purpose of impeachment. *State* v. *Ferguson* (1983), 5 Ohio St. 3d 160, 5 OBR 380, 450 N.E. 2d 265; *State* v. *Gardner* (1979), 59 Ohio St. 2d 14, 13 O.O. 3d 8, 391 N.E. 2d 337. If such evidence is submitted for more than mere impeachment of a witness' credibility, then it is admissible. *State* v. *Williams, supra,* at 36, 21 OBR at 323, 487 N.E. 2d at 563. Although the victim's credibility is indeed being impeached by such evidence:

"* * * the proffered evidence has a more important purpose, which is to negate the implied establishment of an element of the crime charged. For this reason, the probative value of the testimony outweighs any interest the state has in exclusion." *Id.* at 36, 21 OBR at 322-323, 487 N.E. 2d at 563.

This harmonizing of the rape shield statute with the Evidence Rules and the Ohio and United States Constitutions is consistent with the treatment of similar statutes by other states. See Annotation, Constitutionality of "Rape Shield" Statute Restricting Use of Evidence of Victim's Sexual Experiences (1980), 1 A.L.R. 4th 283,

292, at Section 6[a] (and cases discussed therein); Berger, Man's Trial, Woman's Tribulation: Rape Cases in the Courtroom (1977), 77 Colum. L. Rev. 1, 32-39 (discussing in detail the provisions of various rape shield statutes).

Here, the trial court excluded appellant's evidence of the origin of semen not on grounds of relevancy, competency, materiality, prejudicial nature, or mere impeachment, but *solely* on grounds of credibility. Credibility is a matter for the jury as the trier of fact. To allow such an encroachment on the jury's province as the trier of fact is to jeopardize seriously a defendant's constitutional right to a trial by jury, as well as to impinge on his right of confrontation. In the instant case, the trial court's exclusion of appellant's evidence based solely on credibility was error as a matter of law.

The facts and law of the instant case are similar to those in *State* v. *LaClair* (1981), 121 N.H. 743, 433 A. 2d 1326. In *LaClair,* the state introduced into evidence the presence of semen in the victim's vagina. Defendant sought to introduce evidence of the victim's prior sexual activity to prove the origin of the semen. The trial court, applying New Hampshire's rape shield statute (N.H. RSA 632-A:6), ruled such evidence of prior sexual activity inadmissible. The New Hampshire Supreme Court reversed, finding a violation of defendant's confrontation rights. The court concluded:

"The defendant's explanation of the presence of sperm in the prosecutrix's vagina is plausible, supported by medical evidence, and consistent with his defense that he never had sexual relations with her. He should therefore have had an opportunity to present evidence in support of that explanation to the jury." *Id.* at 747, 433 A. 2d at 1330.

Pursuing the analysis, the trial judge's only basis for excluding the evidence herein was that he simply did not believe the testimony of the witness, John Taylor. The judge did not find Taylor's testimony to be inflammatory, prejudicial, or irrelevant to a material fact. Manifestly, the trial judge believed that in this area it was the province of the court to judge the credibility of a witness. Appellant argues that the testimony of John Taylor was material, particularly in light of Tony Tambasco's testimony (serologist from the Mansfield Police Department crime lab) who testified that sperm can live in a woman's vagina for up to five days. Appellant cites *State* v. *Ferguson, supra,* arguing that there the Supreme Court held that where the *sole* intent of a defendant in attempting to present evidence of a victim's past sexual conduct is to impeach the credibility of said victim, the evidence can not be permitted under Ohio's Rape Shield Statute, *i.e.,* R.C. 2907.02. In *Ferguson,* appellant argues, the defendant admitted his sole intention was to impeach the witness. The court in that case found a very tenuous connection with the victim's testimony to prove impeachment. In the case at bar, the defendant's sole purpose was not to impeach Loreen Weeks' testimony, but to produce evidence of the origin of semen from one other than the defendant, which is permitted by R.C. 2907.02(D). There was no evidence of the age of the semen found on Loreen Weeks as there was in *Ferguson.* Here the jury was precluded from finding that the semen may have been deposited by John Taylor or Willie Evans, with whom Weeks was alleged to have had intercourse.

We find the legislature had no intention to carve out an exception to the rubric that credibility of the witnesses is for the jury by its use, in two sep-

arate places, of the following language in R.C. 2907.02(D):

"* * * only to the extent that the court finds * * * that its inflammatory or prejudicial nature does not outweigh its probative value."

Compare Evid. R. 403(A) (which employs similar language, but manifestly precludes the trial judge from determining the credibility of witnesses).

In our view, the phrase "* * * does not outweigh its probative value," used at the end of each of the above quoted paragraphs, means its probative value "assuming it to be true." That language authorizes exclusion of *true* testimony when its inflammatory nature reaches sufficient height. Those words are not a statutory warrant to the trial court to judge credibility and exclude the incredible. They are a mandate to exclude unjustifiably inflammatory evidence, notwithstanding its truth. After all, there is no common-sense reason to weigh the probative value of the incredible against anything. Lies have no probative value. Our point is that when the legislature has a deliberate and conscious purpose to accomplish a desired result, it is not "tongue-tied." It can tell us in plain language that the common world can understand when it intends to carve out a slice of the right of an accused to have the jury decide credibility of otherwise relevant evidence. It has not done so, and we will not impute to the legislature such an intent to derogate from the constitutional rights of an accused person absent express language of its intent to do so.

Actually, upon this record, the trial judge has by his record findings narrowed the issue so that his ruling is prejudicially erroneous absent his inherent power to exclude this testimony solely because he finds it to be incredible.

The prosecutor acknowledges the trial court's findings, but makes an alternative "right for a separate reason" argument, that is, that the evidence proffered does not prove "origin of semen" as required by the statute. We reject that alternative as patently meritless. If the evidence proves anything at all, it proves "origin of semen." The theory that it doesn't depends upon the same power of the trial court to take credibility from the jury by believing the state's expert witness that certain elements of semen present in the victim's vagina could only have survived sixteen hours.

We do not reach the constitutionality of the statute by our ruling, because it turns upon statutory construction. But, see, *State* v. *Williams, supra,* at 35, 21 OBR at 322, 487 N.E. 2d at 562, wherein the court said that "* * * evidence which the rape shield law would render inadmissible would nevertheless be admitted in furtherance of the defendant's constitutional rights. * * *'"

Accordingly, the first assignment of error is sustained.

## II

The second assignment of error claims that the trial court erred in permitting the majority of the state's witnesses to testify due to the state's refusal to apprise defendant of the identities of its witnesses before the day of trial.

Here, the appellant points out that on or about June 4, 1985, defendant filed a request for discovery, requesting the names and addresses of witnesses the state intended to call at trial. The state failed to produce said information. On August 6, 1985, defendant filed a motion *in limine,* to preclude the testimony of any witness of the state whose identity had not been provided to the defendant. Said motion was hand-delivered to the judge and the prosecutor who was to

try the case on August 8, 1985. On September 6, 1985, four days prior to trial, the state provided the defendant with the names of two witnesses it intended to call at trial, Michelle and Mindy Sterritt, whose location, until the third day of trial, was Cleveland, Ohio. On the first day of trial, the state proceeded to apprise defendant of the identities of thirteen additional witnesses. Defendant timely objected to their testimony. The trial court overruled the general objection, but only permitted five of the witnesses to testify. Defendent, through his counsel, during trial and thereafter in a motion for mistrial, strongly objected, claiming surprise.

Defendant's attorney also filed an affidavit claiming prejudice. He claims he was not able to formulate a rebuttal or gather any evidence contrary to the surprise witnesses' testimony, having only spoken to them immediately prior to their testimony. Moreover, there was no preliminary hearing or other method to discover the identities of the state's witnesses.

Counsel admits "in all fairness to the state" that he was able to speak with Tony Tambasco prior to trial, and does not object to his testimony. However, he argues that the alleged victim was in seclusion in Phoenix, Arizona and was not presented by the prosecutor until the first day of trial; that, accordingly, investigation could not be made by defendant with respect to the strength of the state's case; that Officer Grogoza's testimony concerning defendant's arrest and the questioning of the Sterritt children came as a complete surprise; and that Officer Grogoza would not talk with defendant's counsel and refused to allow him to see her sworn statements or those she alleged she took from the Sterritt children. Furthermore, he argues, concerning the Sterritts, that they were not available to defendant until the third day of trial. Defendant's counsel

filed an affidavit on October 1, 1985, with respect to the state's failure to provide discovery and its effect.

He points out that upon motion for same, the prosecutor must provide the above-mentioned information. Crim. R. 16(B)(1)(e). Furthermore, under the Rules of Criminal Procedure, the names and addresses of prosecution witnesses, along with prior felony convictions of those witnesses, must be provided to the defendant upon motion made therefor. Crim. R. 16(B)(1)(e). Finally, he points out that the lab report and the emergency room record were not provided pursuant to the motion for discovery.

A failure to provide the identity of a state witness is excusable if the failure to so provide was inadvertent, or impossible, but it is error to allow the testimony if not justifiable. *State* v. *Edwards* (1976), 49 Ohio St. 2d 31, 3 O.O. 3d 18, 358 N.E. 2d 1051, vacated as to the death penalty (1978), 438 U.S. 911. Here, appellant argues the prosecutor not only ignored the motion *in limine,* but made an aborted attempt at providing the identities of witnesses four days prior to trial and the remaining thirteen names on the day of trial. This is evidence, not of inadvertence as the prosecutor will no doubt claim, but of prosecutorial misconduct, punishable by the precluding of such witness' testimony. *McMullen* v. *Maxwell* (1965), 3 Ohio St. 2d 160, 32 O.O. 2d 150, 209 N.E. 2d 449.

We agree that, generally speaking, failure to provide defendant with any discovery until the day of trial is evidence *per se* of the defendant's inability to effectively present a credible defense. We also agree that attempting to cure the defect by allowing defendant's counsel a short period of time with the state's surprise witnesses immediately prior to their testifying does not provide defendant a sufficient opportunity to defend against their allegations. It also appears to be true that

the defendant was surprised by the state's new evidence which ordinary prudence could not have guarded against, possibly denying defendant a fair trial had such evidence been substantial, especially, where, as here, defendant had been incarcerated for a period in excess of ninety days at the time of trial. Defendant's counsel had already caused a continuance of the August 8, 1985 initial trial date based on the state's early representations that it could not proceed with the case because of the prosecutor's inability to locate the alleged victim until two days before trial. The state joined in this effort. A request for a continuance, when surprised at trial by the state's new evidence, would have subjected the defendant to additional incarceration and a deprivation of his freedom and rights until such time as counsel had an opportunity to investigate the facts behind the new witnesses' testimony. It is honestly debatable whether the limited testimony that the five witnesses who were permitted by the trial court to testify was sufficiently damaging to the accused as to render the trial court's rulings an abuse of discretion upon balance. Given the total absence of record justification for the loose discovery practice here, we must conclude that the point must be resolved in favor of the defense. It rings hollow that the five witnesses were not important. If that be true, why did the state call them?

Accordingly, the second assigned error is sustained.

## III

The third assignment of error that the judgment is against the manifest weight of the evidence as to force or threat of force is overruled. The victim testified that the defendant grabbed her head to force her to have oral sex with him, then dragged her into the bedroom, threw her on the bed and had regular intercourse with her, all of the foregoing after JoEllen Smith had struck her in the kneecap with a baseball bat.

## IV

The fourth assigned error complains of failure to establish a proper claim of possession relative to the so-called sexual assault kit, State's Exhibit 5. Upon careful consideration of the record, we find sufficient custodial accountability to warrant admissibility.

## V

In the fifth assignment of error, appellant objects to the testimony of three witnesses who related the alleged victim's statements to them shortly after the rape. It is overruled.

The first two witnesses, the Nesricks, were downstairs neighbors of the victim and were present when she returned home immediately after the rape. They described her condition as hysterical and related that upon entry into their apartment, she stated, "I have been raped" and "by Marshall."

She then further described the assault, the details of which description the Nesricks related in testifying. One-half hour to forty-five minutes later, Officer Grogoza arrived and the victim, who was still "in a highly emotional state," again described the assault.

The state argues that to qualify as an excited utterance, there must be an occurrence sufficiently startling to render normal reflective thought processes inoperative, and the statement must not have been the result of a reflective thought, citing *State* v. *Dickerson* (1977), 51 Ohio App. 2d 255, 5 O.O. 3d 377, 367 N.E. 2d 927, and *State* v. *Moorman* (1982), 7 Ohio App. 3d 251, 7 OBR 330, 455 N.E. 2d 495. In our opinion, both descriptions of the rape qualify under the excited utterance exception to the hearsay rule, Evid. R. 803(2), that reads:

"Excited utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

The trial court, believing it to be within its discretion, concluded that the evidence could justify a reasonable factfinder's conclusion that the victim was under the influence of the startling event. We agree.

Evid R. 803(2) creates a factual question as to whether the declarant is still under the stress of excitement caused by the rape when she makes her statements. See *State* v. *Martineau* (1974), 114 N.H. 552, 324 A. 2d 718; *State* v. *Crowhurst* (R.I. 1984), 470 A. 2d 1138; McCormick on Evidence (3 Ed. Cleary Ed. 1984) 854, 859, Section 297. The only time requirement imposed by the rule is that the statements be made without a delay which is unexplained or is inconsistent with the occurrence of the offense. The time element is not the controlling factor. The controlling factor is whether the declaration was made under such circumstances as would reasonably show that it resulted from impulse rather than reason and reflection. *Mills* v. *State* (Tex. App. 1981), 626 S.W. 2d 583, 585-586 (statements made some six to eight hours after the rape occurred). Rape often produces a psychological trauma to the victim which may leave her in an excited emotional state for hours after the attack. She may also remain silent and subdued immediately after the rape in order to effectuate a successful escape from the rapist or hostile environment. The victim may reasonably believe that she is not safe or secure enough to express any suppressed excited statements until she reaches a safe destination, usually her home. During her trek home, the victim may well be still in the emotional throes of the traumatic event, incapable of reflection and contemplation.

The state of her emotional condition under such circumstances is a factual question.

In the case *sub judice,* the trial court determined that the victim's experience, which mirrored the above scenario, indicated that her statements to the Nesricks and the police, upon reaching home, were excited utterances. Such factual determination was not an abuse of discretion on the trial court's part.

Allowing the trial court broad discretion to make factual determinations under Evid. R. 803(2), without being hamstrung by strict temporal limitations, has been accepted in other jurisdictions. See Annotation, Time Element as Affecting Admissibility of Statement or Complaint made by Victim of Sex Crime as Res Gestae, Spontaneous Exclamation, or Excited Utterance (1979), 89 A.L.R. 3d 102, 155 *et seq.,* Sections 25-34. The New Hampshire Supreme Court, for example, has stated:

" * * * While it is true that contemporaneity is a factor to be considered in determining the admissibility of such statements, it is by no means controlling, and such things as the nature of the event, the victim's state of mind, and all other circumstances are important considerations. * * * The precise amount of time that may elapse before a statement loses its spontaneity as an excited utterance evoked by a startling event and becomes a mere narrative cannot be established by any absolute rule of law and accordingly, '[m]uch must be left to the discretion of the [trial] court in admitting or rejecting such testimony.' * * * " *State* v. *Martineau, supra,* at 556-557, 324 A. 2d at 721 (statements made two or three hours after incident).

The Rhode Island Supreme Court has also held:

"This court has said that the trial

justice, in considering the admission of alleged spontaneous utterances, must look at all the facts and circumstances before ruling whether or not the hearsay declarant was still laboring under the stress of the exciting event when he or she spoke. * * * The essence of the excited-utterance exception is the inability of the declarant to have reflected on the events about which the statement is concerned. Consequently, the evidence must be judged in terms of spontaneity and an analysis of whether the declaration is the result of thoughtful consideration or the product of an exciting event. The decision about whether the utterance was the result of thoughtful consideration or was the product of an exciting event is a matter addressed to the sound discretion of the trial justice and, once made, will not be overturned unless clearly wrong. * * *" *State* v. *Crowhurst, supra,* at 1145 (statements made as much as three hours after assault).

See, also, *State* v. *Smoot* (1978), 99 Idaho 855, 590 P. 2d 1001 (declaration made morning after rape held admissible); *Hanner* v. *State* (Tex. Crim. App. 1978), 572 S.W. 2d 702, 706, certiorari denied (1979), 440 U.S. 961 (declaration made shortly after escape held admissible).

It is additionally urged by the state that the victim's descriptions of the rape fall under Evid. R. 801(D)(1)(b), prior consistent statement of a witness offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive, which provides that a statement is not hearsay if:

"The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (a) inconsistent with his testimony, and was given under oath subject to cross-examination by the party against whom the statement is offered and subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition, or (b) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive, or (c) one of identification of a person soon after perceiving him, if the circumstances demonstrate the reliability of the prior identification."

When the complaining witness testified, her motive in proceeding with the prosecution quite specifically had been put in issue. We reject this. The point is that the facts giving rise to the motive to falsify existed *before* the disputed consistent statements. This is not an assertion of *recent* fabrication relative to that motive. Hence, Evid. R. 801(D)(1)(b) is inapplicable.

For the foregoing reasons, Assignments of Error I and II are sustained, and Assignments of Error III, IV, and V are overruled. The judgment of the Court of Common Pleas of Richland County is reversed, and this cause is remanded to that court for further proceedings according to law consistent with this decision.

*Judgment reversed and cause remanded.*

WISE, J., concurs.

MILLIGAN, J., concurs in part and dissents in part.

MILLIGAN, J., concurring in part and dissenting in part. The repeated failure of the state to comply with the provisions of Crim. R. 16 could well have led to the consequences prayed for by the appellant in the second assignment of error. Here, however, the trial court elected to control the violation by limiting the number of witnesses that were permitted to testify and by granting a brief continuance.

Under all of the circumstances attendant to this issue, I do not find that the trial court abused its discretion.

I would overrule the second assignment of error.