DECISION AND JOURNAL ENTRY
{¶ 1} Appellant, Alex Nerghes, appeals his conviction by a jury for aggravated assault and rape, and the sentence entered by the Medina County Court of Common Pleas. We affirm.
 I. {¶ 2} On December 12, 2002, Holly Kaznoch reported to work with a black eye causing her eye to be swollen shut, abrasions in the skin around the eye, and a large cut in her eyebrow. On that date, Appellant and Holly had been in a relationship for three years. As a result of the investigation into Holly's injuries, Appellant was arrested and indicted for rape, a felony of the first degree, in violation of R.C. 2907.02(A)(2), kidnapping, a felony of the first degree, in violation of R.C. 2905.01(B)(2), and felonious assault, a felony of the second degree, in violation of R.C. 2903.11(A)(1). Appellant was tried before a jury; the jury convicted Appellant on the rape and assault charges.
 {¶ 3} According to the testimony offered at trial, Holly's supervisor at a local McDonald's restaurant, Gladys Garman, took Holly into the office to question her regarding her injuries and during their conversation, Holly was crying and "she was upset; she was distraught." When questioned further from the bench, Garman stated that Holly "was in bad shape. She was crying; she was shaking. She was — I don't know if she even realized she was there[.]" According to Garman, Holly stated that Holly's boyfriend had hit her, that he had drug her into the bathroom, raped her anally from behind, and when she tried to move, "he hauled off and hit her, and he said, `See what you made me do.'" Holly told Garman that she didn't want to leave work to get treatment because her pay would be docked due to her absence. Garman said she convinced Holly to get treatment, and Holly acquiesced, saying that "it was getting worse and worse." An ambulance transported Holly to the hospital.
 {¶ 4} One of the two paramedics with the ambulance, Charles McCown, testified that upon arrival at McDonald's, he observed Holly in the office and Holly was "crying, very distraught, very terrified." McCown stated that Holly looked like a "[t]rain wreck, [she] looked like somebocye had or something had injured her face and her eye." McCown further described Holly as "very scared, very terrified." McCown testified that when asked the cause of her injuries, Holly stated,
"I was assaulted by my boyfriend. * * * He hit me in the face and knocked me to the floor. * * * My boyfriend assaulted me. This is not the first time. This is an ongoing thing and this is — this time is the worst."
 {¶ 5} McCown stated that the only police officer to arrive at McDonald's was from the Montville Police Department; the officer did not stay or go inside to speak with Holly because the assault occurred in the City of Medina, outside of the police officer's jurisdiction.
 {¶ 6} The second paramedic, Steve Ingersol, confirmed that upon their arrival, Holly was in the office and she was crying and visibly upset. Ingersol testified that Holly said that she was assaulted and hit in the face with a fist; Ingersol stated that her injury was consistent with her account.
 {¶ 7} The treating physician from the emergency room testified that Holly had a black and blue left eye, bruises on her forehead, and a laceration to the eyebrow. The doctor testified that the laceration required sutures and the injuries were so extensive that the doctor ordered a CAT scan to ensure there was no internal bleeding. The doctor also testified that there was a danger of a "delayed bleed' in Holly's head, therefore aftercare included monitoring by another person to ensure that Holly did not become confused, was acting appropriately, and was not sleeping an inordinate amount of time. The doctor stated that when asked how she came to be injured, Holly stated that she was hit in the face by her boyfriend. The doctor read aloud from her treatment report which stated:
"Thirty-three year old female brought in by squad from work. Patient allegedly assaulted last evening by boyfriend who hit her in left eye with fist. Coworker at work called 911. * * * Possible rape involved. Patient had consensual intercourse around 2:30 in evening. Around 10:30 boyfriend wanted rectal intercourse, apparently pulled shirt off, pulled pants and underwear off and pulled to the ground. He then attempted to penetrate her rectally, and patient pulled away. Boyfriend then hit her in the face. Denies vaginal or oral penetration, no ejaculation rectally."
 {¶ 8} The doctor also read aloud a nurse's note on the report which said, "States this happens every time I try to go to work outside the home, and patient denies any other injuries."
 {¶ 9} The doctor testified that the written report reflects the version of events relayed to the doctor by Holly. The doctor also stated that during the time Holly was at the hospital, Holly was emotionally upset, crying, nervous and frightened. The doctor testified that Holly also had a bruise on her shin and on her "bottom" as a result of being "hit in the bottom a couple weeks ago."
 {¶ 10} A police officer from the Medina City Police Department testified that he interviewed Holly at the hospital; at the time, Holly was upset and crying. The officer stated that he asked Holly to write a statement, and then he left the hospital because the matter was turned over to a detective. The officer testified he was summoned to return to the hospital; the detective told the officer that Holly had given a key and consent to enter her apartment in order to arrest Appellant. The officer said that when the police arrived at the apartment, they found Appellant asleep inside; they handcuffed Appellant, advised him of his Miranda rights, and transported him to the police station.
 {¶ 11} The detective testified that when he saw Holly at the hospital, she was crying, distraught, shaking, and "having a difficult time talking about the incident." The detective stated that Holly claimed to have been forced into position for anal sex, and when she pulled away, Appellant spun her around and struck her in her left eye with either his fist or an object. The detective said that Holly voluntarily gave him the key to her apartment and consent to enter it, because she was afraid to return while Appellant was still there. The detective testified that Holly didn't return to the apartment, but stayed with a friend for the next four days. After the indictments were returned, the detective visited Appellant to inform him of the formal charges; Appellant became "very irate" and stated "he didn't know how he could rape or kidnap his own girlfriend; that it was his girlfriend, he supported her for the last three years, he didn't feel it was possible to rape or kidnap her."
 {¶ 12} The next witness to testify was a certified sexual assault nurse examiner from the Developing Options for Violent Emergencies (DOVE) program at Summa Health Systems. The nurse stated that the police referred Holly to the DOVE program and the nurse interviewed Holly. The nurse testified that Holly reported that she was:
"hit in the face, grabbed by the hair, and dragged back into the bathroom. She reported verbal threats of harm. * * * She reported to us that she had sustained forced sex and daily physical assault for the last three years, all of which was — all the injury from that was generally contusions or bruises, abrasions, which would be scrapes, things like that, and hair pulling."
 {¶ 13} Reading from her written report where quotations indicate Holly's own words, the nurse testified:
"Holly states Alex turned the radio on in the bathroom after the children went to bed, quote, so they wouldn't hear, unquote. She states he made her strip and stand naked in the bathroom because he, quote, wanted to inspect, unquote, her to see if she had had sex with anyone that day. She states he frequently, quote, inspects her holes, unquote, to see if she has had sex. She states he proceeded to digitally penetrate her vaginally and anally. * * * She states he made her bend over and grab her toes with her head next to the door. She states he then penetrated her anally with his penis. Because of pain she states she flinched and he, quote, slipped out, unquote. She states when this happened he hit her in the left side of the face causing her to fall to the floor. She states he wiped the blood off her eye and told her, quote, you're a stupid bitch for moving, if you'd held still it would be over by now, unquote. Unable to get another erection, he made her leave the bathroom. She states a few minutes later he grabbed her by the hair and dragged her back in the bathroom. She states he told her he was going to, quote, blacken her other eye for the loser, unquote, once again accusing her of having sex with another man. She states he was unable to get an erection again, so he told her to, quote, get out of my face, unquote. She states she spent the night in the living room and went to work the next morning. She states [Appellant] wanted to know what she was going to tell her coworkers before she left. She states coworkers called EMS and police when they saw her face."
 {¶ 14} The nurse, reading from another portion of the report, testified that she recorded Holly saying, "I'm used to this. It's no better or worse than any other day with him. I don't hardly feel it anymore." The nurse stated that Holly was examined for rape evidence, but no significant evidence was found; the nurse claimed that the examination result is not unusual when someone has been undergoing forced sex for a long period of time.
 {¶ 15} All of the above witnesses were questioned if they or anyone in their presence ever threatened to remove Holly's children from her home, and all testified that such did not occur.
 {¶ 16} Holly's testimony began with her stating that Appellant was insecure in their relationship and often accused her of seeing other men, a topic which always led to arguments. Holly claimed that on December 11, she returned home early from work due to inclement weather, and Appellant accused her of not working that day, but seeing another man instead. Holly stated that the argument ended with the pair having consensual sex, although she was not really interested and participated just to end the argument. Holly said that, later in the evening, Appellant was in the bathroom alone, drinking beer and listening to music. Holly testified that Appellant was intoxicated when she went into the bathroom and they renewed the prior argument; Appellant proceeded to check the pockets of her clothes for phone numbers or a stub showing the hours she was at work. Holly claimed that Appellant frequently checked her pockets for evidence of the suspected assignations. Holly said that she pulled her pants down and told him to check all the pockets; when questioned further, Holly modified her testimony, saying that [Appellant] was asking to check "[her] holes * * * [t]o see if anybody had been in there, in my privates." Holly's testimony vacillated between being sure she had pulled down her own pants, to being uncertain if it was she or Appellant who did. Holly then stated that she was sure she did because "ninety percent of the time when we're fighting like that, I do that to him." When asked about the remaining ten percent of the time, Holly responded, "Honestly, sir, I don't think he's ever pulled my pants down, even at ten percent. I don't think so." Holly further stated that her grand jury testimony was erroneous; she was incorrect when she told the grand jury that Appellant had pulled down her pants and she now thought that she "might have done it." Holly claimed not to remember what she wrote in her police statement; when presented with the statement, Holly acknowledged that she wrote, "He pulled my pants to my ankles and shoved my head to my feet." Holly testified that after her pants were down, Appellant told her he wanted to have anal sex because he believed that she had vaginal sex with someone else that day, and Holly told Appellant to go ahead. When asked if she wanted to do that, Holly responded that, "It didn't matter to me. I would have done it just so the arguing would have stopped. Fine with me." Holly then testified that Appellant had difficulty penetrating her and they both were leaning over towards the floor due to the confined space in the bathroom. Holly said that she was leaned over from the waist, a voluntary action not forced by Appellant, although he had his hand on her back and was pushing her toward the floor. Holly testified that Appellant's attempts at penetration hurt her and she moved; when she did so, "I got hit in the side of my face * * * by [Appellant]." Holly claimed that she didn't know what she was hit with, but she fell to the floor and her eye hurt and was bleeding. Holly said that, afterward, Appellant administered first aid and she went into the living room. Holly further testified that Appellant called her back into the bathroom; she went to the bathroom when "[h]e grabbed me by the shoulder and my hair" and the argument continued. Again, Holly vacillated, claiming that she willingly went to the bathroom, however, Appellant grabbed her hair and shoulder "[b]ecause I told him I didn't feel like arguing" and he said they weren't done yet. Holly said that she didn't call the police because "I was mad at him. I was scared the police would come take him away" and "[h]e probably would have been more mad * * * [a]nd I didn't want to find out" what would happen. However, Holly then testified that she didn't call the police only "[b]ecause I was mad at him." Holly claimed that she didn't recall her grand jury testimony wherein she stated that Appellant pulled her by the hair and drug her into the living room, and she must have been "mixed up" if that was her testimony. Holly stated that she asked Appellant several times to leave, but he wouldn't because he was intoxicated and couldn't drive. Holly said that when she arrived at work, her manager informed her that she couldn't leave because the police were enroute. Holly stated that the police arrived, but she didn't recall an ambulance being there and she didn't remember talking to paramedics. Holly testified that she told the police her injuries were the result of an accident, and the police threatened to "send a cop car up to the school to pick up my kids if I didn't tell them what really happened." Holly said that she was taken to the hospital by her coworker, who stayed with her the entire time, telling Holly "to just listen to whatever the police officer said and to write down anything they asked me to write down." Holly admitted that she was upset while at the hospital, and she couldn't remember if the police officer who spoke with her there was the same officer that she saw at McDonald's. Holly said that she went to St. Thomas hospital, site of the DOVE program, "[b]ecause Ms. Gladys told me that I should go there, and the police suggested that I should go there" for a physical exam. Holly also said that she did not voluntarily give the police her key or consent to their entry into her apartment, but she felt "[t]hey gave me no choice, either pick up my boyfriend or pick up my kids. I gave them my keys." Holly claimed that her grand jury testimony stating Appellant would allow Holly to shower only once a month was an exaggeration spurred by her anger at Appellant. However, Holly admitted that Appellant controlled how often she showered because "[h]e liked to know that I wasn't with anybody else. He figured if I didn't shower, I wouldn't be with anyone else" and "[i]f I was coming out to the house by myself, he didn't want me showering and brushing my teeth * * * [b]ecause he thought maybe I was coming to see somebody." Holly admitted that she had spoken with Appellant, and exchanged letters with him, in an attempt to agree on what happened, because Appellant was drunk and Holly was mad, and the story "got jumbled up and neither one of us really know what happened." However, Holly continued to maintain that her injuries resulted from an accident and "[h]e didn't purposely hurt my face." Holly said that her prior testimony stating he hit her when she moved was incorrect, "[b]ecause it might have just been a reflex. He was leaned over so far, when I moved, we might have both fell into the door." Holly testified, "I still love him very much. I wish he wasn't so jealous." When asked if she had friends, Holly could think of only two women that she sees infrequently; she said that Appellant is her best friend, and she doesn't want anything bad to happen to him. On cross-examination, Holly, answering "yes" and "no" to leading questions, responded affirmatively to statements that the events of December 11, 2002, were typical of their relationship, they frequently accused one another of having other love interests, but the accusations were not taken seriously, the arguments always led to sexual activity, which could include anal sex, that it wasn't unusual for Appellant to check her "holes" as part of their sex play. Holly reiterated that her injuries were accidental, although she couldn't remember what hit her. Holly also said that the sex was consensual, although "[m]aybe not happily" because she "was aggravated and frustrated and tired."
 {¶ 17} At the close of the plaintiff's case, the court entered plaintiff's exhibits 1 through 30 into evidence; the exhibits are photographs of Holly's injured face, taken at the hospital and DOVE.
 {¶ 18} Appellant was the sole defense witness; his testimony included the following:
 {¶ 19} On the evening of December 11, 2002, he was in the bathroom when Holly entered the room and he saw a piece of paper in her pocket. Appellant asked her what it was, and while she was pulling things out of one pocket, he inserted his hand into another of her pockets. He testified, "And she just pulled everything off, and threw it on the floor or something. And I said, `Okay, whatever,' you know. And then we just stood there and talked for a minute." Eventually, he asked her if they would have sex again; Appellant testified:
"[S]he said, `Didn't I do you earlier,' like that, sarcastic like. And I said, `Yes, I guess.' And then we said a few words, and I said, `Well, you must be sore.' And then she got mad, she got up and she — she got up and pulled her pants down and told me to, `Go ahead, stick your dick in there and get it over with.'"
 {¶ 20} Appellant claimed that Holly leaned over a stool and Appellant told her "to stop, to move out of my way. I pushed — I pushed her butt out of my way. She got her butt in my face." Appellant stated that Holly persisted, saying, "Come on, let's get it over with, get your dick hard, stick it in. I told her, `No.'" Appellant told her to:
"[P]ull her pants back up or I'm leaving, and I started to get up to leave. She pushed the door. She told me, `Okay.' She pulled her pants up, and she sat back down on the floor. * * * I was sitting on the toilet. I sat back down on the toilet there, and she was sitting on the floor in front of me."
 {¶ 21} The argument between the two continued, and Appellant decided to leave the room. Holly was still on the floor, and "I swung open the door. * * * [a]nd I didn't realize — I was halfway out the door, and I heard, `My eye, my eye.' * * * I think the door might have hit her." Appellant assisted Holly with washing her injury, and Holly assured him that she was okay. Appellant left the room, and went to the living room to lay down. Holly also came out, and Appellant apologized and offered to leave. Holly asked him not to leave, and she also went to bed, lying next to Appellant.
 {¶ 22} Appellant stated that in their three years together he has never struck Holly or forced her to engage in sex. However, Appellant testified that,
"Every time she lets different people into her life or our life, that starts an argument. Probably people talking stuff to her, she comes home with an attitude and makes it hard for me, and we just end up arguing. And I told her I wasn't going to live like that no more, wasn't no good for me or the kids."
 {¶ 23} Appellant also stated that Holly denies having relationships with other men, but he witnessed her leaving the home of the father of Holly's children two years ago, and that made him suspicious. At one point, Appellant claimed, he attempted to leave Holly when she became violent and "jumped on me and punched me in the back of the head a couple times[.]" Appellant further denied ever striking Holly and he had no knowledge of the bruises on her back and legs. Appellant testified that while he has been in jail, Holly has spoken with him on the phone around thirty times and has visited him there twice; Appellant claimed to have no knowledge of attempts by Holly to assist his case until his mother informed him. Appellant stated that Holly felt she ought to help because the injuries resulted from an accident.
 {¶ 24} On cross-examination, Appellant insisted that Holly fabricated her testimony that Appellant wanted to inspect her body, and her account of her injury was incorrect. Appellant stated that Holly received her injury "when I swung open the door. She didn't fall into the door like she said." Appellant further denied that he asked Holly to assist him with his case by talking with his attorney and writing letters to the judge. Appellant denied telling Holly "to just say your head hit the door[.]" When asked if he told Holly that his hand might have hit her and he would take responsibility, Appellant responded,
"Yes. My hand might have bumped her when I got up or the door hit her when I swung it open. * * * The door — I think the door hit her, but if the door didn't hit her, she keeps saying I hit her with my hand, then my hand must have bumped her. I never punched her. * * * I've never laid a hand on her. She's never been hurt."
 {¶ 25} After Appellant again denied asking Holly to assist his case, the prosecutor played a recording of conversations between Appellant and Holly conducted while he was incarcerated. Quoting the recording, the prosecutor stated, "`It would help me if you went and told them that you got hit with the door,' right? That's what you said, right?" Appellant responded,
"Yes, I probably did. She thinks my hand hit her. I said, `The door hit you.' * * * I didn't tell her what to say. I just said, `Say maybe the door hit you so I don't get in trouble,' or something. * * * Because everybody thinks my hand hit you, and it's a felonious assault. They'll kick me out of the country for no reason. I haven't done nothing wrong. It was an accident. I told her it was an accident."
 {¶ 26} Upon further questioning, Appellant insisted that the testimony of the police, Holly's supervisor, and Holly was all fabricated. Appellant, in an attempt to demonstrate how the door hit Holly, admitted that she was sitting with her right eye toward the door, however, when he opened the door, it hit her left eye.
 {¶ 27} Upon conviction on the charges of rape and felonious assault, Appellant timely appealed, raising three assignments of error.
 II. Assignment of Error No. 1
"The evidence at trial was insufficient to support appellant's rape and felonious assault convictions, and those convictions were against the manifest weight of the evidence."
 {¶ 28} In his first assignment of error, Appellant argues that the evidence presented at trial was insufficient as a matter of law to support the two convictions, and the convictions were against the manifest weight of the evidence. These arguments are without merit.
 {¶ 29} As an initial matter, this court notes that the sufficiency and manifest weight of the evidence are legally distinct issues. State v. Manges, 9th Dist. No. 01CA007850, 2002-Ohio-3193, at ¶ 23, citing State v. Thompkins (1997),78 Ohio St.3d 380, 386. Sufficiency tests whether the prosecution has met its burden of production at trial, whereas a manifest weight challenge questions whether the prosecution has met its burden of persuasion. Manges, at ¶ 25. Because sufficiency is required to take a case to the jury, a finding that a conviction is supported by the weight of the evidence must necessarily include a finding of sufficiency. Thus, a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency. State v. Roberts
(Sept. 17, 1997), 9th Dist. No. 96CA006462, at 4.
 {¶ 30} In reviewing whether a conviction is against the manifest weight of the evidence, this court must:
"[R]eview the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339,340.
 {¶ 31} The testimony of Appellant and Holly was confused, inconsistent, and demonstrative of an ongoing abusive relationship. The State provided ample testimony from disinterested professionals that was consistent and more credible than the testimony of the two principals. Upon review of the entire record, the weight of the evidence, all reasonable inferences, and the credibility of the witnesses, we cannot find that the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Because we find that the convictions were not against the manifest weight of the evidence, we also find that the evidence was sufficient to take to the jury. Appellant's first assignment of error is overruled.
 Assignment of Error No. 2
"The trial court erred by admitting hearsay evidence of the alleged victim's statements to her manager at work and to the police, which were made the following morning several hours after the incident took place, as an excited utterance under evid. r. 803(2)."
 {¶ 32} In his second assignment of error, Appellant argues that the testimony of Gladys Garman and the police detective regarding the statements made by Holly to them the day after the assault were inadmissible hearsay, and it was error for the court to admit the statements under the exception for excited utterances.
 {¶ 33} Given its superior vantage point, the trial court enjoys broad discretion in the admission and exclusion of evidence and will not be reversed absent a clear abuse which had materially prejudiced the defendant. State v. Hymore (1967),9 Ohio St.2d 122, 128, certiorari denied (1968), 390 U.S. 1024. An abuse of discretion connotes more than an error of law or judgment as it implies the court's attitude was unreasonable, arbitrary, or unconscionable. Steiner v. Custer (1940),137 Ohio St. 448; State v. Adams (1980), 62 Ohio St.2d 151, 157.
 {¶ 34} The trial court reasoned that the witnesses could repeat the hearsay statements pursuant to the excited utterance exception. Evid. R. 803(2). The rule declares: "Excited Utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."
 {¶ 35} Appellant's argument focuses upon the time difference between the rape and assault and Holly's discussion with the testifying witnesses the next day. However, even before the adoption of the rules of evidence, Ohio has continuously recognized that the declarant's statement need not be strictly contemporaneous with the cause of excitement. State v. Duncan
(1978), 53 Ohio St.2d 215, 220. "The passage of time is relevant but not dispositive." State v. Jones, 7th Dist. No. 00 JE 18, 2002-Ohio-2791, at ¶ 90, citing State v. Taylor (1993),66 Ohio St.3d 295, 300. The hearsay testimony should be admitted if, under the particular facts of the case, sufficient indicia of trust-worthiness are present. State v. Valentine (Aug. 9, 1989), 9th Dist. No. 88CA004458, at 3-4. There are other emotional displays apart from pure excitement which may suggest that the reflective processes have been stilled. See State v. Smith
(1986), 34 Ohio App.3d 180, 190.
 {¶ 36} The Supreme Court of Ohio has held that an out-of-court statement which would otherwise constitute inadmissible hearsay may be admissible as an excited utterance if the trial judge reasonably finds facts to indicate that a startling event, observed by the declarant, occurred which produced sufficient nervous excitement in the declarant to still his reflective faculties, thus rendering the statement spontaneous and unreflective. State v. Duncan (1978),53 Ohio St.2d 215, paragraph one of the syllabus; Potter v. Baker
(1955), 162 Ohio St. 488, paragraph two of the syllabus. The out-of-court statement must be made "`before there ha[s] been time for such nervous excitement to lose a domination over his reflective faculties,'" thus ensuring the statement is not the product of conscious fabrication. State v. Wallace (1988),37 Ohio St.3d 87, 89, quoting Potter, 162 Ohio St., at paragraph two of the syllabus. Where a declarant is agitated, in serious pain, and still under the stress of an assault, the declarant's statements can be said to be excited utterances. State v.Huertas (1990), 51 Ohio St.3d 22, 31. The pertinent question is whether the declarant "is still under the stress of nervous excitement from the event." State v. Boston (1989),46 Ohio St.3d 108, 118; State v. Wagner (1986), 30 Ohio App.3d 261,264.
 {¶ 37} The day after the assault took place, Holly reported as usual to work. Gladys Garman noticed, however, that Holly was bruised, cut, and in need of medical attention. When she questioned Holly about injuries, Holly stated that her boyfriend hit her. She told the same to the police detective who interviewed her later at the hospital. The testimony of all the prosecution witnesses, including Holly, was that she was upset, crying, and frightened. The testimony demonstrates that when Holly made her statements, she was agitated over the rape, the assault, and the resultant need for emergency medical care. There was sufficient evidence to support the trial court's finding that the statement was admissible as an excited utterance, and we find no abuse of discretion. Accordingly, we overrule appellant's second assignment of error.
 Assignment of Error No. 3
"The trial court erred in sentencing appellant, who had never previously served a prison term, to more than the shortest prison terms authorized by law."
 {¶ 38} Appellant argues that the imposition of a five year sentence is contrary to law because he has never been in prison, and the trial court's findings are not supported by the record. Further, Appellant argues that pursuant to the seriousness and recidivism factors of R.C. 2929.12, his conduct is less serious than conduct normally constituting the offense because "the victim induced or facilitated the offenses" and he did not intend harm when committing the assault and the rape. In regard to the recidivism factors, Appellant claims that he "led a law-abiding life for a significant number of years," the circumstances giving rise to the offense are unlikely to recur, and "the offender showed genuine remorse for the offense."
 {¶ 39} An appellate court may remand a case for re-sentencing if it clearly and convincingly finds that the trial court's findings are unsupported by the record or that the sentence imposed by the trial court is otherwise contrary to law. R.C.2953.08(G). Clear and convincing evidence is evidence "`which will produce * * * a firm belief or conviction as to the allegations sought to be established.'" State v. Eppinger
(2001), 91 Ohio St.3d 158, 164, quoting Cross v. Ledford
(1954), 161 Ohio St. 469, 477.
 {¶ 40} The applicable record to be reviewed by the appellate court shall include the following; (1) the presentence investigative report; (2) the trial court record in the case in which the sentence was imposed; and (3) any oral or written statements made to or by the court at the sentencing hearing at which the sentence was imposed. R.C. 2953.08(F).
 {¶ 41} In the transcript of the sentencing, the trial court states that it reviewed a presentence investigation. Appellant's counsel conceded that "I have reviewed the presentence report, and basically it is accurate." The presentence investigation is not included in the record on appeal. Pursuant App.R. 9 and Loc.R. 5, an appellant bears the burden of ensuring that the record necessary to determine the appeal is before the appellate court. State v. McCowan, 9th Dist. No. 02CA008124, 2003-Ohio-1797, at ¶ 6. If the record is incomplete, a reviewing court must presume that the trial court acted with regularity and with sufficient evidence to support its findings. Id. Consequently, we find that Appellant's sentence is supported by the record.
 {¶ 42} We now address Appellant's argument that the sentence is contrary to law. Upon a conviction for rape, a prison term is mandatory. R.C. 2929.13(F)(2). R.C. 2929.14(A)(1) requires a prison term of three, four, five, six, seven, eight, nine or ten years, for a felony of the first degree. A court shall impose the shortest prison term authorized for the offense by R.C.2929.14(A), unless the court finds that the shortest prison term will demean the seriousness of the offender's conduct or will not adequately protect the public from future crime by the offender or others. R.C. 2929.14(B)(2).
 {¶ 43} The Ohio Supreme Court has interpreted R.C. 2929.14(B) to mean that "unless a court imposes the shortest term authorized on a felony offender who has never served a prison term, the record of the sentencing hearing must reflect that the court found that either or both of the two statutorily sanctioned reasons for exceeding the minimum term warranted the longer sentence." State v. Edmonson (1999), 86 Ohio St.3d 324, 326.
 {¶ 44} The seriousness factors the court must consider before imposing more than a minimum sentence include:
"(1) The physical or mental injury suffered by the victim of the offense due to the conduct of the offender[.]
"(2) The victim of the offense suffered serious physical, psychological, or economic harm as a result of the offense.
"* * *.
"(6) The offender's relationship with the victim facilitated the offense." R.C. 2929.12(B).
 {¶ 45} The trial court must also consider recidivism factors in imposing more than the minimum sentence; those factors include:
"(2) Prior to committing the offense, the offender had not been convicted or pleaded guilty to a criminal offense.
"(3) Prior to committing the offense, the offender had led a law-abiding life for a significant number of years.
"(4) The offense was committed under circumstances not likely to recur.
"(5) The offender shows genuine remorse for the offense." R.C.2929.12(E).
 {¶ 46} At the hearing, Appellant offered as mitigating factors that a rape did not occur despite the conviction, that the victims injuries have healed, that the victim provoked Appellant, perhaps deliberately, and that "[s]he brought this on herself." Further, Appellant argues that this type of incident is not likely to recur, that he has no past criminal record, that "this incident was caused as much by Holly as it was by [Appellant]," and he is a likely to be deported as a result of this conviction.
 {¶ 47} The evidence at trial demonstrates that this is an offense which occurred repeatedly in the past. Appellant's statements at sentencing indicate not only a total lack of remorse, but denial that a rape occurred. The trial court, upon review of all the evidence, found that a minimum sentence would demean the seriousness of the offense and would not adequately protect the public. The trial court complied with the statute in imposing sentence; therefore, the sentence is not contrary to law. Appellant's third assignment of error is overruled.
 III. {¶ 48} Appellant's three assignments of error are overruled. The judgment of the Medina County Court of Common Pleas is affirmed.
Judgment affirmed.
Carr, J, concurs in judgment only.
Batchelder, J., concurs.