DECISION AND JOURNAL ENTRY
{¶ 1} Appellant, Verdell Bullard, appeals his conviction and sentence out of the Wayne County Court of Common Pleas. This Court affirms.
 I. {¶ 2} On December 3, 2007, Bullard was indicted on two counts of aggravated murder in violation of R.C. 2903.01, unclassified felonies; one count of kidnapping in violation of R.C. 2905.01, a felony of the first degree; one count of tampering with evidence in violation of R.C. 2921.12, a felony of the third degree; and one count of abuse of a corpse in violation of R.C. 2927.01, a felony of the fifth degree. Bullard pleaded not guilty to the charges. The matter proceeded to trial. At the conclusion of the State's case in chief, the trial court granted Bullard's motion to dismiss count two, the second count of aggravated murder, premised on prior calculation and design. At the conclusion of all the evidence and before submitting the case to the jury for deliberation, the trial court instructed the jury on aggravated murder, along with the *Page 2 
lesser offenses of murder and involuntary manslaughter; on kidnapping along with the lesser offenses of abduction and unlawful restraint; and on tampering with evidence and abuse of a corpse.
 {¶ 3} At the conclusion of trial, the jury found Bullard not guilty of aggravated murder, murder, kidnapping and unlawful restraint. The jury found Bullard guilty of involuntary manslaughter, abduction, tampering with evidence and abuse of a corpse. The trial court sentenced Bullard to 10 years in prison for the offense of involuntary manslaughter, 4 years for abduction, 5 years for tampering with evidence, and 12 months for abuse of a corpse. The trial court ordered that all sentences were to be served consecutively for a total of 20 years incarceration. Bullard timely appealed, raising six assignments of error for review. This Court rearranges some assignments of error and consolidates others for ease of review.
 II. ASSIGNMENT OF ERROR I "THE TRIAL COURT COMMITTED PLAIN ERROR IN VIOLATION OF THE DOUBLE JEOPARDY CLAUSE OF U.S. CONST. AMEND. V AND XIV, AND OHIO CONST. ART I, SEC. 10, BY FINDING LEON BULLARD GUILTY OF ABDUCTION AND SENTENCING HIM THEREFOR, WHILE AT THE SAME TIME FINDING HIM GUILTY OF INVOLUNTARY MANSLAUGHTER BASED ON THE COMMISSION OF THE CRIME OF ABDUCTION AND SENTENCING HIM THEREFOR."
 {¶ 4} Bullard argues that his convictions for both involuntary manslaughter premised on abduction and abduction itself violate the constitutional prohibitions against double jeopardy because abduction constitutes a lesser included offense of involuntary manslaughter. This Court disagrees.
 {¶ 5} The Ohio Supreme Court has held that "[t]he Double Jeopardy Clauses contained in the Ohio and United States Constitutions protect an accused from multiple prosecutions and *Page 3 
multiple punishments for the same offense." Shearman v. Van Camp (1992),64 Ohio St.3d 468, 469. The Ohio Supreme Court set out the test to determine whether an offense is a lesser included offense of another:
 "An offense may be a lesser included offense of another if (i) the offense carries a lesser penalty than the other; (ii) the greater offense cannot, as statutorily defined, ever be committed without the lesser offense, as statutorily defined, also being committed; and (iii) some element of the greater offense is not required to prove the commission of the lesser offense." State v. Deem (1988), 40 Ohio St.3d 205, paragraph three of the syllabus.
 {¶ 6} R.C. 2903.04(A) enunciates the elements of involuntary manslaughter: "No person shall cause the death of another *** as a proximate result of the offender's committing or attempting to commit a felony." This Court takes well the State's argument that the second prong of the Deem test is not satisfied because involuntary manslaughter, the greater offense, may be committed without the lesser offense, abduction, also being committed because any other felony may serve as the underlying offense.
 {¶ 7} The Ohio Supreme Court has addressed a similar issue regarding whether double jeopardy principles preclude punishment for both felony murder and an underlying kidnapping, holding that "it is well established that `felony-murder under R.C. 2903.01(B) is not an allied offense of similar import to the underlying felony. *** That being the case, R.C. 2941.25 [(distinguishing allied offenses of similar import from those of dissimilar import)] authorizes punishment for both crimes, and no double jeopardy violation occurs.'" State v. Campbell (2000),90 Ohio St.3d 320, 347, quoting State v. Keene (1998), 81 Ohio St.3d 646,668. The Second District Court of Appeals has expressly held that involuntary manslaughter and abduction are not allied offenses because the two offenses "do not `correspond to such a degree that the commission of one offense will result in the commission of the other.'"State v. Carlisle (Nov. 16, 1994), 2d Dist. No. 13901, quoting State v.Mughni (1987), 33 Ohio St.3d 65, 67. This *Page 4 
Court agrees with such logic and reasoning and holds that Bullard's separate convictions and sentences for involuntary manslaughter and abduction do not violate the Double Jeopardy Clauses of the United States and Ohio Constitutions. Bullard's first assignment of error is overruled.
 ASSIGNMENT OF ERROR IV "THE TRIAL COURT COMMITTED PLAIN ERROR BY PERMITTING THE JURY TO VIEW A DVD RECORDING OF A STATEMENT TO POLICE BY LEON BULLARD, WHICH SAID STATEMENT WAS COERCED, IN VIOLATION OF U.S. CONST. AMEND. V AND XIV, AND OHIO CONST. ART. I, SEC. 10."
 {¶ 8} Bullard argues that the trial court committed plain error by allowing the jury to view and hear his recorded statement to the police. This Court disagrees.
 {¶ 9} Pursuant to Crim. R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." To constitute plain error, the error "must be obvious and have a substantial adverse impact on both the integrity of, and the public's confidence in, the judicial proceedings." State v.Tichon (1995), 102 Ohio App.3d 758, 767. A reviewing court must take notice of plain error only with the utmost caution, and only then to prevent a manifest miscarriage of justice. State v. Bray, 9th Dist. No. 03CA008241, 2004-Ohio-1067, at ¶ 12. This Court may not reverse the judgment of the trial court on the basis of plain error, unless Bullard has established that the outcome of the trial clearly would have been different but for the alleged error. State v. Kobelka, 9th Dist. No. 01CA007808, 2001-Ohio-1723, citing State v. Waddell (1996),75 Ohio St.3d 163, 166.
 {¶ 10} Harmless error, on the other hand, includes "[a]ny error, defect, irregularity, or variance which does not affect substantial rights" and shall, therefore, "be disregarded." Crim. R. 52(A). Harmless error, by definition, would have no impact on the outcome of the trial. *Page 5 
 {¶ 11} This Court notes, not only did defense counsel fail to object to the playing of Bullard's recorded interview with the police, but defense counsel referred to portions of the interview during closing argument. In fact, in arguing to the jury in support of self-defense, defense counsel relied on Bullard's police interview, stating: "How do we know. You heard the tape." Because Bullard relied on the recording when arguing his case to the jury, any alleged error of which he now complains regarding the admission of the recording would be harmless.
 {¶ 12} Moreover, this Court cannot say that the admission into evidence of Bullard's statement to the police constituted error at all. Bullard relied on the statement in support of his own case. Accordingly, the admission of the statement was beneficial to him, rather than prejudicial. In other words, Bullard has failed to demonstrate any "substantial adverse impact" on the proceedings. See Tichon,102 Ohio App.3d at 767. Bullard's fourth assignment of error is overruled.
 ASSIGNMENT OF ERROR II "THE VERDICT OF GUILTY OF THE CRIME OF ABDUCTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 ASSIGNMENT OF ERROR III "THE VERDICT OF GUILTY OF THE CRIME OF INVOLUNTARY MANSLAUGHTER WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 13} Bullard argues that his convictions for abduction and involuntary manslaughter are against the weight of the evidence. This Court disagrees.
 "In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339, paragraph one of the syllabus. *Page 6 
This discretionary power should be exercised only in exceptional cases where the evidence presented weighs heavily in favor of the defendant and against conviction. Id. at 340.
 {¶ 14} Bullard was convicted of involuntary manslaughter in violation of R.C. 2903.04(A), which states: "No person shall cause the death of another *** as a proximate result of the offender's committing or attempting to commit a felony." Bullard does not dispute that he stabbed the victim to death. The underlying felony on which the involuntary manslaughter conviction was premised was abduction. Bullard argues that this conviction was against the manifest weight of the evidence solely because his conviction for abduction was against the manifest weight of the evidence.
 {¶ 15} Bullard was further convicted of abduction in violation of R.C. 2905.02(A)(1) or (2), which state: "No person, without privilege to do so, shall knowingly do any of the following: (1) By force or threat, remove another from the place where the other person is found; (2) By force or threat, restrain the liberty of another person under circumstances that create a risk of physical harm to the victim or place the other person in fear[.]"
 {¶ 16} R.C. 2901.22(B) states:
 "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."
 {¶ 17} "Privilege" is defined as "an immunity, license, or right conferred by law, bestowed by express or implied grant, arising out of status, position, office, or relationship, or growing out of necessity." R.C. 2901.01(A)(12).
 {¶ 18} "Force" is defined as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). *Page 7 
 {¶ 19} "Physical harm to persons" is defined as "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3).
 {¶ 20} The undisputed evidence in this case is that Rey Melendez began drinking heavily on the evening of November 10, 2007, and into the morning of November 11, 2007, concluding his drinking at Three Amigos. Bullard was also drinking at Three Amigos into the morning of November 11, 2007. When Three Amigos closed, Melendez hailed a taxi cab for a ride home. He then told the cab driver that he did not want a cab after all. Charles Myers, a cab driver for Miller Taxi, testified that he saw Melendez leave with another person in a white sport utility vehicle around 3:00 a.m. Melendez, Matthew Ferguson, Mikey McClain and Bullard subsequently arrived at Bullard's home. At some point, Melendez pushed Bullard and ran away. Bullard, Ferguson and McClain then got in Bullard's fiancée's vehicle and drove off to find Melendez. Bullard let Ferguson and McClain out of the vehicle so they could call a cab to drive them home. Bullard drove back home, where he found Melendez outside. Bullard and Melendez eventually ended up in Bullard's basement, where Bullard stabbed Melendez multiple times. Melendez died, and Bullard transported his body to a remote location in a wooded area, poured gasoline on the body and set it on fire. Bullard does not dispute killing Melendez.
 {¶ 21} Bullard first argues that he was privileged to bring Melendez inside his home and detain him there because Melendez returned to Bullard's home after pushing him and fleeing. Bullard argues that Melendez' return to Bullard's yard somehow bestowed a license upon Bullard to be allowed to discuss the matter with Melendez "inside, in a finished room furnished with bookcases and a sofa." Bullard cites no legal authority for the creation of any such license under the circumstances, and this Court can find none. *Page 8 
 {¶ 22} Second, Bullard argues that he was privileged to remove and detain Melendez because he believed that the victim had committed a felony, specifically, the theft of Bullard's credit card. There is no evidence in the record that Melendez had Bullard's credit card. Presumably, when Bullard stripped Melendez after killing him, went through his wallet, and later burned all of the victim's belongings, Bullard's credit card would have been found on or about Melendez' person.
 {¶ 23} During his interview with the police, Bullard reported that Melendez grabbed something from his hand but he could not identify what the victim took from him. Bullard speculated that Melendez might have taken one of Bullard's credit cards because one turned up missing, but he could not identify any object which might have been taken with any certainty. Bullard further reported to police that he "walked" Melendez into Bullard's house to get his "stuff" back. However, it was only later that Bullard believed one of his credit cards turned up missing.
 {¶ 24} Matthew Ferguson testified that he witnessed Melendez push Bullard outside of Bullard's home and run away. He testified that he did not know why Melendez pushed Bullard and that he did not know whether Melendez took anything from Bullard.
 {¶ 25} Bullard further argues that he was privileged to remove and detain Melendez upon suspicion that the victim had committed a robbery by use of a deadly weapon, specifically a knife. Bullard told the police that Melendez pulled a knife on him in his home. He further told the police that he burned Melendez' knife in the fire pit, along with all of Melendez' other belongings. Brian Peterman, Deputy State Fire Marshall, testified that he participated in the investigation. Mr. Peterman testified that he sifted through the ashes in Bullard's fire pit, even using magnets to locate metal. He testified that he recovered brass boot eyelets, buckles, and *Page 9 
remnants of a zipper and a cell phone, but he did not find a knife. He estimated that the fire in which Bullard burned Melendez' belongings would have reached between 500 and 700 degrees. He testified that the metal items he found would have melted at 1500 degrees, and the fire never reached that temperature. Mr. Peterman then testified that steel melts at 2500 to 3000 degrees, so even the cheapest grade knife would not have melted in Bullard's fire.
 {¶ 26} Dorothy Garver testified that she knew Melendez because he was her cousin's fiancé. She further testified that she had been drinking with Melendez at Three Amigos on November 10 and 11, 2007. Ms. Garver testified that Melendez sometimes carried a pocketknife, but that he was not carrying it the night he was killed. Ms. Garver testified that she showed the police detectives Melendez' pocketknife during the course of their investigation into his disappearance and death. Bullard told the police during his interview that he did not know Melendez. Ms. Garver testified that she saw Bullard whisper something in Melendez' ear at Three Amigos but she witnessed no further interaction, or any tension or altercation between the two men.
 {¶ 27} Bullard next argues that there is no evidence that he used any force or threat to remove Melendez from the place where he was found. Vincent Bullard, the defendant's twin brother, testified that Bullard called him between 4:00 and 4:30 a.m. on November 11, 2007, sounding very upset, nervous and scared. Vincent testified that Bullard told him that he had to kill someone who had tried to stab and kill him in Bullard's basement. Vincent testified that Bullard told him that the victim got into Bullard's basement after "[Bullard] walked the dude in," although he testified that it did not sound as though Bullard forced Melendez inside the home and down the basement. *Page 10 
 {¶ 28} Dr. Lisa Kohler, Summit County Medical Examiner, testified that Melendez' blood alcohol level determined during the post mortem examination was .218. She also testified that Melendez had suffered significant blunt force trauma to his head, resulting in subdural hematoma. Bullard admitted during his police interview that he punched Melendez in the face after he found him outside his home. Bullard further confessed to the police that he "walked" Melendez into his home. He informed the police that he held Melendez from behind by the back of his collar and walked him in because he wanted to get Melendez inside the house.
 {¶ 29} Finally, Bullard argues that there is no evidence that he restrained Melendez' liberty under circumstances which created a risk of physical harm to the victim or placed the victim in fear. Bullard admitted to the police during his interview that he and Melendez were on the basement floor wrestling, as Bullard held one of the victim's hands out away from his body and stabbed Melendez in the neck. The victim's fiancée, Lucille Sovel, testified that Melendez called her some time around 3:30 a.m. on November 11, 2007, "screaming for his life, telling me he's dying." She testified that he asked her to call 911.
 {¶ 30} Dr. Kohler performed the post mortem examination of the victim. She testified that Melendez suffered significant blunt force trauma to his head and face, as well as numerous stab wounds to his head, neck, chest and upper extremities, including characteristic defensive wounds to his hands. Dr. Amy Jolliff, Wayne County Coroner, observed the post mortem examination of Melendez' body. Based on those observations, as well as her review of Dr. Kohler's autopsy report and findings, Dr. Jolliff concluded that the victim died of exsanguination, or bleeding out, as a result of multiple stab wounds. She also recognized the significant blunt force trauma to his head. *Page 11 
 {¶ 31} A review of the record indicates that this is not the exceptional case, where the evidence weighs heavily in favor of Bullard. A thorough review of the record compels this Court to find no indication that the trier of fact lost its way and committed a manifest miscarriage of justice in convicting Bullard of abduction and involuntary manslaughter. The weight of the evidence supports the conclusion that Bullard has no reasonable belief that Melendez had committed any felony so that Bullard was privileged to remove and/or restrain the victim. There is no evidence that Bullard was aware that Melendez occasionally carried a pocketknife. Furthermore, Melendez' pocketknife was with his belongings in his home, not in the fire pit where Bullard admitted to burning all of Melendez' possessions. The Deputy Fire Marshall testified that the fire would not have burned with the requisite heat to melt a knife.
 {¶ 32} The weight of the evidence further supports the conclusion that Bullard removed Melendez from his yard into his basement by force. Bullard admitted punching Melendez in the face. Both the Summit County Medical Examiner and the Wayne County Coroner testified that the victim suffered significant head trauma, resulting in subdural hematoma. Bullard also admitted to the police that he "walked" Melendez into his home and down to the basement by holding onto the victim's collar and directing the movements of the extremely intoxicated Melendez.
 {¶ 33} The weight of the evidence supports, as well, the conclusion that Bullard restrained Melendez' liberty by force under circumstances which created a risk of physical harm to the victim. Bullard admitted to the police that he held one of Melendez' arms away from his body as he stabbed Melendez in the neck. Melendez further made a cell phone call from Bullard's basement to his fiancée, screaming in fear of impending death. *Page 12 
 {¶ 34} Upon review, Bullard's conviction for abduction is not against the manifest weight of the evidence. As Bullard only challenged his conviction for involuntary manslaughter on the basis of a lack of evidence to establish the underlying felony of abduction, his involuntary manslaughter conviction is likewise not against the manifest weight of the evidence. Bullard's second and third assignments of error are overruled.
 ASSIGNMENT OF ERROR V "THE SENTENCING OF LEON BULLARD IS VOID AS A MATTER OF LAW BECAUSE THE SENTENCING COURT DID NOT GIVE THE PROPER NOTICES OF BOTH PRE-RELEASE AND POST-RELEASE ADMINISTRATIVE EXTENSIONS OF LEON BULLARD'S PRISON TERM AT BOTH THE SENTENCING HEARING AND IN THE JOURNAL ENTRY OF SENTENCING, AS REQUIRED BY R.C.[]2929.19(B)(3) AND STATE V. JORDAN"
 {¶ 35} Bullard argues that his sentence is void because the trial court failed to advise him: (1) pursuant to R.C. 2929.19(B)(3)(b) that he may be subject to sanctions, specifically the extension of his prison term, for violations of prison rules; and (2) pursuant to R.C. 2929.19(B)(3)(c) regarding post-release sanctions. This Court disagrees.
 {¶ 36} R.C. 2929.19(B)(3)(b) stated, in relevant part and at the time relevant to sentencing, that when imposing sentence, the trial court "shall *** [n]otify the offender that, as part of the sentence, the parole board may extend the stated prison term for certain violations of prison rules for up to one-half of the stated prison term[.]" In reliance on the Ohio Supreme Court's decision in State ex rel. Bray v.Russell (2000), 89 Ohio St.3d 132, 136, wherein the high court held Ohio's "bad time" statute unconstitutional, this Court held that "the notification requirement as set forth in R.C. 2929.19(B)(3)(b) is moot."State v. Geiger, 9th Dist. No. 22073, 2004-Ohio-7189, at ¶ 20. Accordingly, Bullard's sentence is not void for lack of notification pursuant to R.C. 2929.19(B)(3)(b). *Page 13 
 {¶ 37} R.C. 2929.19(B)(3)(c) requires the trial court to "[n]otify the offender that the offender will be supervised *** after the offender leaves prison if the offender is being sentenced for [certain degrees or types of felonies]." The Ohio Supreme Court has held that "when sentencing a felony offender to a term of imprisonment, a trial court is required to notify the offender at the sentencing hearing about postrelease control and is further required to incorporate that notice into its journal entry imposing sentence." State v. Jordan,104 Ohio St.3d 21, 2004-Ohio-6085, at ¶ 17.
 {¶ 38} In this case, the trial court notified Bullard during his sentencing hearing that he would be subject to post-release control. The trial court further incorporated that notice in its journal entry of sentencing, stating that Bullard "was notified that he will be subject to post release control for up to five (5) years after his release from prison." Such notice comports with the requirements of R.C. 2929.19(B)(3)(c). See Jordan at ¶ 17.
 {¶ 39} Bullard's fifth assignment of error is overruled.
 ASSIGNMENT OF ERROR VI "THE TRIAL COURT COMMITTED PLAIN ERROR BY SENTENCING LEON BULLARD IN VIOLATION OF U.S. CONST. AMEND. VI, XIV, AND OHIO CONST. ART. I, SEC. 10, AS INTERPRETED BY BLAKELY V. WASHINGTON, APPRENDI V. NEW JERSEY, AND STATE V. FOSTER."
 {¶ 40} Bullard argues that the trial court committed plain error by imposing an excessive sentence on him. This Court disagrees.
 {¶ 41} Bullard first argues that the trial court's discretion in sentencing is tempered by the requirement that sentences not be "irrational." The Ohio Supreme Court clearly held in State v.Foster, 109 Ohio St.3d 1, 2006-Ohio-856, at paragraph seven of the syllabus: "Trial courts have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or give their reasons for imposing maximum, consecutive, or more *Page 14 
than the minimum sentences." Bullard's sentences fall within the applicable statutory ranges. Accordingly, the trial court did not commit plain error in this regard.
 {¶ 42} Bullard next argues that the trial court committed plain error by considering "hearsay facts originating from non-trial witnesses" as contained in the pre-sentence investigation. The pre-sentence investigation report is not included in the record before this Court. We recently held:
 "In cases decided before Foster, this Court consistently held that the omission of a pre-sentence investigation report from the record limited this Court's ability to review the trial court's findings. See, e.g., State v. Nerghes, 9th Dist. No. 03CA0049-M, 2004-Ohio-1235, at ¶ 41. Although trial courts are no longer required to make findings, this Court continues to presume regularity with respect to factual determinations made by the trial court to the extent that the trial court relied on the pre-sentence investigation, but does so in the context of determining whether the record demonstrates an abuse of discretion. See, e.g., State v. Clevenger, 9th Dist. No. 07CA009208, 2007-Ohio-7034, at ¶ 5." State v. Hultz, 9th Dist. No. 07CA0043, 2008-Ohio-4153, at ¶ 13.
Bullard does not argue that the trial court abused its discretion. Rather, he argues that the trial court committed plain error in its sentencing order. Furthermore, there is nothing in the record to indicate any abuse of discretion by the trial court.
 {¶ 43} Third, Bullard argues that the trial court committed plain error by considering the statements of non-witness Abbey Dean, Bullard's fiancée, as testified to by police witnesses or commented upon by the State. The trial court's statements at sentencing as to the evidence in this case, however, reflected statements Bullard himself confessed to the police during his interview.
 {¶ 44} Bullard concluded his argument: "If there is merit in Error No. 4, the excessive sentence here should be reversed and remanded for compliance with the Blakely/Foster line of cases." This Court found no merit to Bullard's fourth assignment of error. The sixth assignment of error is overruled. *Page 15 
 III. {¶ 45} Bullard's assignments of error are overruled. The judgment of the Wayne County Court of Common Pleas is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Wayne, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App. R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App. R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App. R. 30.
Costs taxed to Appellant.
WHITMORE, J. DICKINSON, P. J. CONCUR. *Page 1